Slip Op. 06-109

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| TEMBEC, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| and | : | |
| | : | |
| GOVERNMENT OF CANADA, | : | |
| GOUVERNEMENT DU QUEBEC, | : | |
| GOVERNMENT OF ONTARIO, | : | |
| GOVERNMENT OF ALBERTA, | : | |
| GOVERNMENT OF BRITISH | : | |
| COLUMBIA, CANADIAN LUMBER | : | |
| TRADE ALLIANCE, and ABITIBI- | : | Before: Jane A. Restani, Chief Judge, |
| CONSOLIDATED, INC., | : | Judith M. Barzilay & Richard K. Eaton, |
| | : | Judges |
| Plaintiff-Intervenors, | : | |
| | : | Consol. Court No. 05-00028 |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| COALITION FOR FAIR LUMBER | : | |
| IMPORTS EXECUTIVE COMMITTEE, | : | |
| | : | |
| Defendant-Intervenor. | : | |
| | : | |

**OPINION**

Decided: July 21, 2006

[Defendant's and Defendant-Intervenor's motions to dismiss are denied. Plaintiff's and Plaintiff-Intervenors' cross-motions for summary judgment are granted in part.]

Baker & Hostetler, LLP (Elliot Jay Feldman, Bryan Jay Brown, John Burke, Robert Lewis LaFrankie) for Plaintiff Tembec, Inc.

Arnold & Porter, LLP (Michael Tod Shor) for Plaintiff-Intervenor Abitibi-Consolidated, Inc.

Steptoe & Johnson, LLP (Mark Astley Moran, Alice Alexandra Kipel, Sheldon E. Hochberg, Michael Thomas Gershberg) for Plaintiff-Intervenor Canadian Lumber Trade Alliance Executive Committee.

Arent Fox Kintner Plotkin & Kahn, PLLC (Matthew J. Clark, Keith Richard Marino) for Plaintiff-Intervenor Gouvernement du Quebec.

Hogan & Hartson, LLP (Mark S. McConnell, Craig Anderson Lewis, Harold Deen Kaplan, Jonathan Thomas Stoel) for Plaintiff-Intervenor Government of Ontario.

Akin, Gump, Strauss, Hauer & Feld, LLP (Spencer Stewart Griffith, Bernd G. Janzen, Anne K. Cusick, Jason Alexander Park) for Plaintiff-Intervenor Government of British Columbia.

Weil, Gotshal & Manges, LLP (M. Jean Anderson, Amy Tross Dixon, Gregory Husisian, Jahna Hartwig, John Michael Ryan, J. Sloane Strickler); Wilmer, Cutler, Pickering, Hale & Dorr, LLP (Randolph Daniel Moss) for Plaintiff-Intervenor Government of Canada.

Arnold & Porter, LLP (Claire Elizabeth Reade) for Plaintiff-Intervenor Government of Alberta.

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; (Jeanne E. Davidson), Deputy Director; (Stephen Carl Tosini), Commercial Litigation Branch, Civil Division, United States Department of Justice; Dean Pinkert, Senior Attorney, Office of the Chief Counsel for Import Administration, Department of Commerce; Theodore R. Posner, Associate General Counsel, Office of the United States Trade Representative for Defendant United States.

Dewey Ballantine, LLP (Kevin M. Dempsey, Alan William Wolff, Harry Lewis Clark, David Adrian Bentley) for Defendant-Intervenor Coalition for Fair Lumber Imports Executive Committee.

Per Curium:  The Canadian lumber industry, the Canadian federal government, and several of Canada's provincial governments seek to invalidate the action of the United States Trade Representative ("USTR") ordering implementation of an International Trade Commission ("ITC") determination finding an affirmative threat of material injury arising from imports of

Canadian softwood lumber into the United States.  Plaintiff Tembec, Inc. ("Tembec"), Plaintiff-

Intervenor Canadian Lumber Trade Alliance ("CLTA"), and Plaintiff-Intervenors the

Governments of Canada[1] (collectively "Plaintiffs") allege that the United States has illegally

continued to enforce antidumping ("AD") and countervailing duty ("CVD") orders following the

illegal implementation of an affirmative injury determination issued by the ITC pursuant to

section 129 of the Uruguay Round Agreements Act ("URAA").[2]  Defendant United States and

Defendant-Intervenor Coalition for Fair Lumber Imports Executive Committee ("CFLI")

(collectively "Defendants") move to dismiss pursuant to USCIT Rules 12(b)(1), for lack of

subject matter jurisdiction, and 12(b)(5), for failure to state a claim upon which relief can be

granted.  See Def.'s Mem. Supp. Mot. Dismiss 1 ("Def.'s Mem."); Def.-Intervenor's Mem. Law

Supp. Mot. Dismiss 1 ("Def.-Int.'s Mem.").  Plaintiffs cross-move for summary judgment.  The

court grants Plaintiffs' motions in part and finds that the USTR improperly interpreted and

applied section 129.  The court reserves decision on the remedy to be imposed**.**

---

[1] In this opinion, the term "Governments of Canada" refers to Plaintiff-Intervenors the Government of Canada and the Governments of Alberta, British Columbia, Ontario, and Quebec.

[2] Uruguay Round Agreements Act, Pub. L. No. 103-465, § 129, 108 Stat. 4809, 4836–39 (1994), codified at 19 U.S.C. § 3538 (2000) ("section 129").

**I. Procedural History**[3]

Softwood lumber has been a perennial sore-spot in trade relations between the United

States and Canada.[4] The U.S. softwood lumber industry has long maintained that Canadian

softwood lumber exports are sold at "less than fair value" in the United States and that Canada

subsidizes the Canadian softwood lumber industry, injuring the U.S. industry. For five years,

litigation over Canadian softwood lumber imports was limited by a 1996 agreement governing

the importation of softwood lumber from Canada. See Canadian Exports of Softwood Lumber,

61 Fed. Reg. 28,626 (U.S. Trade Rep. June 5, 1996) (notice of agreement; monitoring and

enforcement pursuant to sections 301 and 306). That hiatus ended when the agreement expired

---

[3] Due to the complex series of events involved in this case, the court has attached a procedural history in time-line format at Appendix A. Appendix B contains the full text of section 129(a)–(c), codified at 19 U.S.C. § 3538(a)–(c).

[4] CFLI petitioned, unsuccessfully, for countervailing duties on softwood lumber from Canada in 1982. See Certain Softwood Products from Canada, 48 Fed. Reg. 24,159, 24,160 (Dep't Commerce May 31, 1983) (final negative countervailing duty determinations). CFLI filed another petition in 1986, which eventually led to a preliminary determination finding that Canadian softwood lumber industry was subsidized. Certain Softwood Lumber Products from Canada, 51 Fed. Reg. 37,453 (Dep't Commerce Oct. 22, 1986) (preliminary affirmative countervailing duty determination). Prior to entry of a final determination, Canada and the United States entered into a Memorandum of Understanding settling this dispute. See Certain Softwood Lumber Products from Canada, 56 Fed. Reg. 56,055 (Dep't Commerce Oct. 31, 1991) (self-initiation of countervailing duty investigation). In 1991, Commerce initiated an investigation into subsidization of the Canadian softwood lumber industry. Id. Though the investigation resulted in a CVD order, that order was overturned by a binational panel convened under the U.S.-Canada Free Trade Agreement ("U.S.-CAFTA"). See Certain Softwood Lumber Products from Canada, 59 Fed. Reg. 42,029, 42,029 (Dep't Commerce Aug. 16, 1994) (notice of panel decision, revocation of countervailing duty order and termination of suspension of liquidation). On May 29, 1996, the United States and Canada finalized an agreement governing the importation of softwood lumber into the United States. Canadian Exports of Softwood Lumber, 61 Fed. Reg. 28,626 (U.S. Trade Rep. June 5, 1996) (notice of agreement; monitoring and enforcement pursuant to sections 301 and 306). See generally Canada-U.S. Softwood Lumber Relations, 1982–2005, available at: http://www.dfait-maeci.gc.ca/eicb/softwood/chrono-en.asp (last visited July 20, 2006).

on March 31, 2001.  See Certain Softwood Lumber Products from Canada, 66 Fed. Reg. 21,328,

21,331 (Dep't Commerce Apr. 30, 2001) (notice of initiation of antidumping duty investigation).

Following expiration of the agreement, on April 2, 2001, CFLI and several other U.S. entities

filed a petition with U.S. Department of Commerce ("Commerce") and the ITC, alleging that an

industry in the United States was materially injured and threatened with material injury by

reason of subsidized and less-than-fair-value imports of softwood lumber from Canada.[5]

See Softwood Lumber from Canada, 66 Fed. Reg. 18,508 (Int'l Trade Comm'n Apr. 9, 2001)

(institution of countervailing duty and antidumping investigations and scheduling of preliminary

phase investigations).  The ITC instituted investigations pursuant to that petition on April 9,

2001.  Id.

On May 16, 2002, the ITC issued a final determination that the domestic industry was

threatened with material injury by reason of imports of softwood lumber from Canada.

Softwood Lumber from Canada, Inv. Nos. 701-TA-414, 731-TA-928 (Final), USITC Pub. 3509

(May 2002) ("May 16, 2002 Determination").  On May 22, 2002, Commerce issued AD and

CVD orders on certain softwood lumber products from Canada.  Certain Softwood Lumber

Products from Canada, 67 Fed. Reg. 36,068 (Dep't Commerce May 22, 2002) (notice of

amended final determination of sales at less than fair value and notice of antidumping order);

---

[5]  The process of imposing AD or CVD duties begins with an investigation.  Commerce may start an investigation on its own initiative, or an investigation may be prompted by a petition from the domestic industry.  See 19 U.S.C. §§ 1671a(a)–(b), 1673a(a)–(b) (2000).

Commerce and the ITC are authorized to conduct investigations and impose AD and CVD duties on imported goods under Title VII of the Smoot-Hawley Tariff Act of 1930, as amended by the Trade Agreement Act of 1979 ("Title VII").  See Tariff Act of 1930, 71 Cong. Ch. 497, Title VII, § 701 et seq., 46 Stat. 590 (1930) as amended by Pub. L. No. 96-39, Title I, § 101, 93 Stat. 144, 151 (1979)  (codified as amended in part at 19 U.S.C. §§ 1671, 1673 et seq.).

Certain Softwood Lumber Products from Canada, 67 Fed. Reg. 36,070 (Dep't Commerce May

22, 2002) (notice of amended final affirmative countervailing duty determination and notice of

countervailing duty order) (collectively "May 22, 2002 Orders"). That day, CLTA and the

Ontario Forest Industries Association filed petitions for binational panel review with the U.S.

section of the North American Free Trade Agreement ("NAFTA") Secretariat, later followed by

petitions from Tembec and the Ontario Lumber Manufacturers Association. See North

American Free-Trade Agreement, Article 1904 NAFTA Panel Reviews, 67 Fed. Reg. 41,955

(Dep't Commerce June 20, 2002) (notice of first request for panel review). While the NAFTA

Panel reviewed the ITC's May 16, 2002 Determination, in April 2003, the Canadian government

requested the formation of a World Trade Organization ("WTO") panel to review the ITC's May

16, 2002 Determination for consistency with the WTO Antidumping and Subsidies agreements.[6]

See Pls.' J. Statement of Undisputed Facts ¶ 12. Thus, the ITC's May 16, 2002 Determination

was concurrently subject to review in two separate fora, applying different bodies of law.

The NAFTA Panel issued its decision on September 5, 2003, finding that the ITC's

injury determination was not supported by substantial evidence or in accordance with U.S. law.

See In the Matter of Certain Softwood Lumber Products from Canada, USA-CDA-2002-1904-

07, Panel Decision (Sept. 5, 2003) ("NAFTA First Remand"). The NAFTA Panel therefore

remanded to the ITC with instructions to report back within one hundred days. Id. at 115. On

---

[6] See Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1A, Legal Instruments – Results of the Uruguay Round 33 I.L.M. 1125 (1994) ("Antidumping Agreement"); Agreement on Subsidies and Countervailing Measures, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1A, Legal Instruments – Results of the Uruguay Round 33 I.L.M. 1125 (1994) ("Subsidies Agreement").

December 15, 2003, the ITC issued its remand determination, again finding an affirmative threat

of injury. See In the Matter of Certain Softwood Lumber Products from Canada, USA-CDA-

2002-1904-07, Remand Decision, at 3 (Apr. 19, 2004) ("NAFTA Second Remand"). On April

19, 2004, the NAFTA Panel issued its Second Remand report, finding that the ITC's remand

determination was not supported by substantial evidence or in accordance with U.S. law. Id. at

51–52. The ITC was given 21 days in which to issue a second remand determination. Id. at 53.

Meanwhile, on March 22, 2004, the WTO Panel issued its decision finding that the ITC's

affirmative determination was not consistent with the United States' WTO obligations. Panel

Report, United States – Investigation of the International Trade Commission in Softwood

Lumber from Canada, WT/DS277/R (Mar. 22, 2004) ("WTO Panel report"). On April 26, 2004,

the Dispute Settlement Body ("DSB") of the WTO adopted the WTO Panel report. Rather than

appeal to the WTO Appellate Body ("AB"), on June 14, 2004, the USTR sent a letter, pursuant

to section 129(a)(1) of the URAA, to the ITC requesting an advisory report as to whether the

ITC would be able to implement the WTO Panel report in accordance with Title VII of the Trade

Act of 1930. See Letter from Robert B. Zoellick, USTR, to Deanna T. Okun, Chairman, ITC

(June 14, 2004) AR 2. On July 14, 2004, the ITC replied that it would be able to render its

determination "not inconsistent" with the WTO Panel report under Title VII. See Letter from

Stephen Koplan, Chairman, ITC, to Robert B. Zoellick, USTR (July 14, 2004) AR 3. On July

27, 2004, the USTR requested that the ITC issue a determination pursuant to section 129(a)(4) of

the URAA. See Letter from Robert B. Zoellick, USTR, to Stephen Koplan, Chairman, ITC (July

27, 2004) AR 4. In response, on August 5, 2004, the ITC published notice in the Federal

Register that it was instituting a section 129(a)(4) proceeding. See Softwood Lumber from

<u>Canada</u>, 69 Fed. Reg. 47,461 (Int'l Trade Comm'n Aug. 5, 2004) (notice of institution of proceeding).

While the ITC and USTR were determining how to respond to the adverse WTO Panel report, the ITC submitted a revised threat of injury analysis per the NAFTA Panel's Second Remand on June 10, 2004. <u>See</u> <u>In the Matter of Certain Softwood Lumber Products from Canada</u>, USA-CDA-2002-1904-07, Remand Decision, at 2 (Aug. 31, 2004) ("NAFTA Third Remand"). Once again, the ITC remand determination found a threat of material injury. <u>Id.</u> On August 31, 2004, the NAFTA Panel returned its third report, finding that the ITC had not corrected inadequacies in its injury analysis, and giving the ITC ten days to issue a new determination. <u>Id.</u> at 13. On September 10, 2004, the ITC relented and issued a determination finding no threat of material injury to the domestic industry resulting from imports of softwood lumber from Canada. <u>See</u> <u>Softwood Lumber from Canada</u>, Inv. Nos. 701-TA-414, 731-TA-928 (Final) (Third Remand), USITC Pub. 3815, Views on Remand (Sept. 10, 2004) ("Negative Remand Determination"). The NAFTA panel affirmed this determination on October 12, 2004. <u>See</u> <u>Certain Softwood Lumber Products from Canada</u>, 69 Fed. Reg. 69,584, 69,585 (Dep't Commerce Nov. 30, 2004) (NAFTA panel decision). On October 25, 2004, a "notice of final panel action" was published by the NAFTA Secretariat. <u>Id.</u>

On November 24, 2004, the United States requested that an Extraordinary Challenge Committee ("ECC") review the NAFTA Panel's Third Remand.[7] <u>Certain Softwood Lumber</u>

---

[7] NAFTA provides that a Member may seek review of a NAFTA Panel report by an ECC if the involved party alleges gross misconduct or bias by a panel member, a serious departure from fundamental rules of procedure, or that the panel manifestly exceeded its power, authority or jurisdiction. North American Free Trade Agreement, U.S.-Can.-Mex., art. 1904.13, Dec. 17, 1992, 32 I.L.M. 605, 683–84 (1993).

Products from Canada, 69 Fed. Reg. 70,235 (Dep't Commerce Dec. 3, 2004) (notice of request

for Extraordinary Challenge Committee).  On the same day, and despite having issued the

Negative Remand Determination, the ITC issued a determination pursuant to section 129(a)(4)

finding that the domestic industry was threatened with material injury by reason of imports of

softwood lumber.  Softwood Lumber from Canada, 701-TA-414, 701-TA-928 (Final), Section

129 Determination (Nov. 24, 2004) AR 5 ("Section 129 Determination")[8]; see also WTO

Dispute Settlement Proceeding Regarding Investigation of the International Trade Commission

in Softwood Lumber from Canada, 70 Fed. Reg. 36,687, 36,688 (U.S. Trade Rep. June 24, 2005)

(notice and request for comments) (noting date of Section 129 Determination).

Pursuant to the ITC's Negative Remand Determination of September 10, 2004, on

November 30, 2004, Commerce published a notice in the Federal Register:

> Consistent with the decision of the United States Court of Appeals for the Federal
> Circuit ("Federal Circuit") in Timken Co. v. United States, 893 F.2d 337 (Fed.
> Cir. 1990) . . . , the Department of Commerce . . . is notifying the public that the
> Third Remand for antidumping and countervailing duty investigations in Certain
> Softwood Lumber Products from Canada and the Notice of Final Panel action
> issued by the NAFTA Panel reviewing the ITC's determinations . . . are not "in
> harmony" with the ITC's original results.

69 Fed. Reg. at 69,584 ("Timken notice").[9]

_____

[8]  The Section 129 Determination is available at: http://63.173.254.5/fopin.129.pdf (last
visited July 20, 2006).

[9]  Following an adverse ruling by this Court or a NAFTA panel, publication of a Timken
notice serves to remove the "presumption of correctness" enjoyed by an agency action.  Post-
Timken notice entries will be liquidated in accordance with the court's or NAFTA panel's
determination if such determination is upheld on appeal, or if the time for appeal elapses.
See Timken, 893 F.2d at 342.
        Pursuant to 19 U.S.C. § 1516a(g)(5)(B), the Timken notice in this case was to be
published within 10 days of the issuance of the NAFTA panel decision, or by November 4, 2004.
In fact, publication was not made until November 30, 2004.  The notice set forth that "the

Returning to the WTO track, on December 10, 2004, the USTR instructed Commerce to amend the May 22, 2002 Orders to implement the ITC's section 129(a)(4) determination.[10]  See Letter from Robert B. Zoellick, USTR, to Donald L. Evans, Sec'y, Dep't Commerce (Dec. 10, 2004) AR 6 ("I request that the Department [of Commerce] effectuate this implementation by amending the antidumping and countervailing duty orders on softwood lumber products from Canada, published on May 22, 2002 . . . to reflect the issuance and implementation of the Commission's Section 129 determination.").  Commerce carried out the USTR's instructions on December 20, 2004.  Certain Softwood Lumber Products from Canada, 69 Fed. Reg. 75,916 (Dep't Commerce Dec. 20, 2004) (amendment to antidumping and countervailing duty orders).  The United States then informed the WTO Panel that it had complied with the recommendations of the WTO Panel report.  On February 15, 2005, Canada requested that the WTO form a panel ("Article 21.5 Panel") to review the measures taken by the ITC to render its determination

_____

Department must publish notice of decision . . . which is 'not in harmony' with the Department's results . . . . Publication of this notice fulfills [this] obligation . . . . [T]his notice will serve to suspend liquidation of entries [made] on or after November 4, 2004, i.e., 10 days from the issuance of the Notice of Final Action." 69 Fed. Reg. at 69,584.  Thus, the parties have treated November 4, 2004 as the Timken notice effective date, as it was the last lawful day that notice of an adverse decision could be published.

[10]  The parties and the court use the term "implement" to indicate action taken by Commerce (the "administering authority") to "give domestic legal effect" to a determination by Commerce or the ITC.  For example, once the ITC issues a section 129 determination, it has no domestic legal effect until Commerce "implements" the determination.  The court understands the act of "giving domestic legal effect" to mean that the determination is used to "support" an AD or CVD order.  Thus, if a section 129 determination were partially negative, and the USTR ordered Commerce to implement that determination, Commerce would do so by partially revoking the outstanding AD or CVD order, using the analysis of the section 129 determination to "support" the remainder of the order still in effect.  The court will therefore use the term "support" in reference to an AD or CVD order to indicate that the analysis of the determination in question constitutes the legal justification for the imposition of AD or CVD duties.

consistent with the United States' WTO obligations.[11]  See Request for the Establishment of an

Article 21.5 Panel, United States – Investigation of the Int'l Trade Comm'n in Softwood Lumber

from Canada, WT/DS277/8 (Feb. 15, 2005).

Review of the NAFTA Third Remand and the Section 129 Determination continued in

separate fora, with mixed results.  On August 10, 2005, the ECC unanimously dismissed the

United States' challenge to the NAFTA Panel's Third Remand, thus upholding the NAFTA

Panel's finding that the May 16, 2002 Determination was inconsistent with U.S. law.  See In the

Matter of Certain Softwood Lumber Products from Canada, ECC-2004-1904-01-USA, Opinion

and Order of the ECC (Aug. 10, 2005).  The NAFTA Secretariat published a notice of the ECC's

decision on August 16, 2005.  North American Free-Trade Agreement, Article 1904 NAFTA

Panel Reviews, 70 Fed. Reg. 48,103 (Dep't Commerce Aug. 16, 2005) (notice of decision and

completion of Extraordinary Challenge Committee).  On November 15, 2005, however, the

WTO Article 21.5 Panel found the ITC's Section 129 Determination consistent with the United

States' WTO obligations.  Panel Report, United States – Investigation of the International Trade

Commission in Softwood Lumber from Canada – Recourse to Article 21.5 of the DSU by

Canada, WT/DS277/RW (Nov. 15, 2005).[12]  Commerce therefore continued collecting deposits

---

[11]  A WTO panel may be convened to review whether "measures taken to comply" with
an adverse WTO report have in fact brought a Member's practices into accordance with the
Member's WTO obligations.  See Understanding on Rules and Procedures Governing the
Settlement of Disputes, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade
Organization, Annex 2, Legal Instruments – Results of the Uruguay Round, 33 I.L.M. 1125,
1226 (1994) ("DSU"); see also infra p. 41.

[12]  The AB has since "reversed" the Article 21.5 Panel's report.  See Appellate Body
Report, United States – Investigation of the International Trade Commission in Softwood
Lumber from Canada – Recourse to Article 21.5 of the DSU by Canada, WT/DS277/AB/RW
(Apr. 13, 2006).  The AB reversed the Article 21.5 Panel's findings "on the grounds that the

pursuant to the May 22, 2002 Orders as "amended" to reflect the ITC's Section 129

Determination. At the time Plaintiffs' motions for summary judgment were filed, the total

deposits collected pursuant to the May 22, 2002 Orders exceeded four billion U.S. dollars.

See Pls.' J. Statement of Undisputed Facts ¶ 6; Def.'s Counterstatement of Material Fact ¶ 6.

Plaintiff Tembec filed a summons and complaint in this Court on January 19, 2005,

alleging under section 702 of the Administrative Procedure Act ("APA") that the USTR's action

ordering Commerce to implement the Section 129 Determination was not in accordance with

law. Defendants moved to dismiss this action for lack of subject-matter jurisdiction and failure

to state a claim upon which relief can be granted. In response, Plaintiffs filed for summary

judgment claiming that the USTR's actions were not in accordance with section 129. To prevail

on their claims for summary judgment, Plaintiffs must show that there is no genuine issue of

material fact and that they are entitled to judgment as a matter of law. Celotex Corp. v. Catrett,

477 U.S. 317, 323 (1986).

## II.    Subject Matter Jurisdiction

The court begins with a consideration of whether it possesses the authority, both statutory

and constitutional, to hear this case. Subject matter jurisdiction constitutes a "threshold matter,"

and without it, a case must be dismissed without proceeding to the merits. See Steel Co. v.

Citizens for a Better Env't, 523 U.S. 83, 94 (1998). "The burden of establishing jurisdiction lies

---

Panel articulated and applied an incorrect standard of review to the Section 129 Determination."
Id. ¶ 141. The AB did not, however, find sufficient undisputed facts on the record to enable it to
"complete the analysis." Id. ¶ 160. As a result, the AB "express[ed] no views on the consistency
or inconsistency of the Section 129 Determination" with the United States' WTO obligations.
Id. ¶ 161. The AB consequently found that it was "unable to make a recommendation to the
Dispute Settlement Body." Id. ¶ 163.

with the party seeking to invoke th[e] Court's jurisdiction." Bhullar v. United States, 27 CIT,

__, __, 259 F. Supp. 2d 1332, 1334 (2003) (citing Old Republic Ins. Co. v. United States, 14 CIT

377, 379, 741 F. Supp. 1570, 1573 (1990)), aff'd, 93 F. App'x 218 (Fed. Cir. Mar. 2, 2004).

This matter involves a number of discrete jurisdictional issues. First, the court must

consider certain mandatory limits on its power to hear this case; including Plaintiffs' standing

under the Article III 'case and controversy' requirement; Plaintiffs' right to bring suit

challenging the USTR's interpretation of section 129; and the statutory authority of this Court to

hear such claims under 28 U.S.C. § 1581 (2000). Second, the court must consider certain

prudential limits on its authority to hear the case, including Plaintiffs' standing under the "zone

of interests" test, as well as the political question doctrine.

## A.      Mandatory Limitations on Jurisdiction

### 1.      Constitutional Standing

Article III of the U.S. Constitution requires federal courts to adjudicate only "actual

Cases and Controversies." Utah v. Evans, 536 U.S. 452, 459 (2002) (quotations omitted); U.S.

Const. art. III, § 2. To show an actual case or controversy, plaintiffs must "[1] allege personal

injury [2] fairly traceable to the defendant's allegedly unlawful conduct and [3] likely to be

redressed by the requested relief." Dep't of Commerce v. U.S. House of Representatives, 525

U.S. 316, 329 (1999) (quoting Allen v. Wright, 468 U.S. 737, 751 (1984) (quotations omitted)).

It is apparent that Plaintiffs have alleged personal injuries fairly traceable to the allegedly

unlawful conduct of the USTR. As to the private plaintiffs, which are Canadian producers and

exporters of softwood lumber, they have paid, and continue to pay, cash deposits on merchandise

that they exported to the United States subject to the May 22, 2002 Orders. Tembec Am. &

Supplemental Compl. ¶ 5.  Pecuniary injury constitutes injury in fact.  See Elkem Metals Co. v.

United States, 26 CIT 398, 401, 196 F. Supp. 2d 1367, 1371 (2002) ("Probable economic injury

suffices to establish standing.").  Private plaintiffs assert that these deposits have been collected

by virtue of the USTR's illegal action ordering Commerce to implement the Section 129

Determination.  See Tembec Am. & Supplemental Compl. ¶¶ 5–9, 14–15, 23–25, 27–29, 31–32,

34–36.  CLTA brings the same claims against the United States on behalf of its members.[13]  See

---

[13]  CLTA represents the Alberta Forest Products Association, the British Columbia Lumber Trade Council (including its constituent associations, the Council of Forest Industries and the Coast Forest & Lumber Association, and their member companies), the Free Trade Lumber Council (including its constituent association the Canadian Wood Pallet Association and its  member companies), the Ontario Forest Industries Association, the Ontario Lumber Manufacturers Association, and the Quebec Lumber Manufacturers Association.  See CLTA Compl. 1–2 n.1, ¶ 6.  Although CLTA has not suffered direct injury, it may obtain "[associational] standing solely as the representative of its members."  Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 342 (1977) (citing Warth v. Seldin, 422 U.S. 490, 511 (1975) (quotations omitted)).

A party acquires associational standing by showing that "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claims asserted nor the relief requested requires the participation of the individual members in the lawsuit."  McKinney v. U.S. Dep't of the Treasury, 799 F.2d 1544, 1550 n.13 (Fed. Cir. 1986) (quoting Hunt, 432 U.S. at 343).  CLTA fulfills the first prong of this test because its members represent various Canadian softwood lumber exporters serving the United States market that are subject to the May 22, 2002 Orders.  See CLTA Compl. ¶ 8.  CLTA meets the conditions of the second prong because it "was formed to defend the interests of Canadian softwood lumber producers and exporters in the softwood lumber AD and CVD investigations that began in April 2001" that led to the imposition of the AD and CVD orders.  CLTA Compl. ¶ 9.  Finally, nothing suggests that CLTA's members need to directly participate in this suit to assert their claims and obtain relief.  See Pl. CLTA's Mem. Supp. Mot. Summ. J. & Resp. Defs.' Mot. Dismiss 59–61 ("Pl.-CLTA's Mem."); cf. U.S. Cane Sugar Refiners' Ass'n v. Block, 3 CIT 196, 202, 544 F. Supp. 883, 887 (1982), aff'd, 683 F.2d 399 (C.C.P.A. 1982).  Thus, CLTA has the associational standing required to bring this suit.

Relatedly, Defendant argues that this action must be dismissed insofar as Plaintiffs have requested a refund of all cash deposits collected pursuant to the May 22, 2002 Orders, including those collected from entities not represented in this action.  Def.'s Mem. 43–44.  This argument mischaracterizes the nature of Plaintiffs' suit.  The court is called upon to consider the authority of the USTR to order implementation of the Section 129 Determination.  If the court finds that the USTR's action was ultra vires, the court will invalidate that action.  The fact that the ITC's

CLTA Compl. ¶¶ 4, 7–8, 12, 21–23, 25–27, 29–30, 32–34.  Defendants argue that the USTR's action in ordering implementation of the Section 129 Determination was legal, but otherwise have not disputed that the private plaintiffs are lumber producers that have paid cash deposits under the May 22, 2002 Orders.

The Governments of Canada allege injury in the form of damage to their respective economies and lost tax revenue.[14]  See Can. Gov'ts' Mem. Supp. Mot. Summ. J. & Resp. Defs.' Mot. Dismiss 71 ("Pl.-GOC's Mem.").  Defendants do not appear to dispute this assertion.[15]  The deprivation of tax revenue has been recognized as an injury in fact in other contexts.  See, e.g., Mount Evans Co. v. Madigan, 14 F.3d 1444, 1451–52 (10th Cir. 1994) (finding that county had standing to sue based on the loss of revenue sharing and tax revenue stemming from decision by

existing Negative Remand Determination may lead to a refund of some or all cash deposits does not change the nature of this inquiry, nor does the fact that persons other than Plaintiffs may incidentally be benefitted by invalidation of the USTR's order render Plaintiffs' claims invalid as an attempt to litigate the rights of third parties.

[14]  Because the Governments of Canada have asserted claims bearing on their individual economic losses stemming from the AD and CVD orders, and not based merely on the rights of other plaintiffs, they do not fall within the prudential prohibition on jus tertii standing.  See Clinton v. City of New York, 524 U.S. 417, 433 (1998) ("The Court routinely recognizes probable economic injury resulting from governmental actions that alter competitive conditions as sufficient to satisfy the Article III 'injury-in-fact' requirement.  It follows logically that any petitioner who is likely to suffer economic injury as a result of governmental action that changes market conditions satisfies this part of the standing test.") (quoting 3 K. Davis & R. Pierce, Administrative Law Treatise 13–14 (3d ed. 1994) (quotations, brackets & ellipses omitted)); 19 U.S.C. § 1677(9)(B) (2000); Customs Courts Act of 1980, H.R. Rep. No. 96-1235, at 28 (1980) (marking Congressional intent to "enlarge[ ] the class of persons eligible to sue in civil actions in the Court of International Trade to include . . . foreign governments" and thereby implicitly acknowledging that foreign sovereigns possess their own claims).

[15]  Defendant-Intervenor has argued that the Governments of Canada lack standing to seek refunds of cash deposits collected, but has made no mention of the economic impact of continued collection of cash deposits under the May 22, 2002 Orders.  See  Def.-Int.'s Resp. Pls.' Mot. Summ. J. & Reply Supp. Mot. Dismiss ("Def.-Int.'s Reply")  46 n. 35.

U.S. Forest Service not to rebuild certain park facilities after forest fire). The Governments of

Canada also assert that the loss of tax revenue stems directly from economic injury inflicted on

softwood lumber companies located within their borders. See Pl.-GOC's Mem. 71. This claim

is sufficient to show causation. See Bennett v. Spear, 520 U.S. 154, 168–69 (1997) (rejecting

arguments "equat[ing] injury 'fairly traceable' to the defendant with injury as to which the

defendant's actions are the very last step in the chain of causation"); see also Singleton v. Wulff,

428 U.S. 106, 113 (1976); United States v. Students Challenging Regulatory Agency Procedures

(SCRAP), 412 U.S. 669, 689 n.14 (1973).

A favorable judgment from the court would afford relief for these claimed injuries. The

court is not asked to review the Section 129 Determination itself for consistency with U.S. law.[16]

Rather, the court is asked to review whether the USTR had authority to order implementation of

the Section 129 Determination under section 129(a). A victory for Plaintiffs would result in

invalidation of the USTR's order to Commerce that resulted in implementation of the Section

129 Determination. Because implementation is necessary to give a determination "domestic

legal effect," that is, to support an order, a finding that the USTR improperly ordered

implementation of the Section 129 Determination will prevent the use of that determination to

support the May 22, 2002 Orders. The parties appear to concede that, absent implementation of

the Section 129 Determination, the Negative Remand Determination would control. See Def.'s

Mem. 40; Def.-Int.'s Mem. 44. Nor do Defendants appear to dispute that, if the Section 129

Determination were not implemented, the deposits collected after issuance of the Timken notice

---

[16] Before this Court, such an action properly would be brought under 19 U.S.C.
§ 1516a(a)(2)(B)(vii) (2000) and reviewed pursuant to 28 U.S.C. § 1581(c).

would be returned to Plaintiffs. <u>See</u> Def.'s Mem. 40; Def.-Int.'s Mem. 46. Thus, all parties

agree that a finding that implementation of the Section 129 Determination was <u>ultra</u> <u>vires</u> would

result in a refund, pursuant to the Negative Remand Determination, of some or all of the cash

deposits collected. The possibility of such a refund, as well as the revocation of the May 22,

2002 Orders, satisfies the "redressability" prong of the standing inquiry.

      2.     **Mootness**

Having found that Plaintiffs meet the requirements of standing, the court must also

determine whether any intervening events have mooted this case. <u>See</u> <u>Friends of the Earth, Inc.</u>

<u>v. Laidlaw Envtl. Servs. (TOC), Inc.</u>, 528 U.S. 167, 189 (2000) ("The requisite personal interest

that must exist at the commencement of the litigation . . . must continue throughout its

existence.") (quoting <u>Arizonans for Official English v. Arizona</u>, 520 U.S. 43, 68 n.22 (1997)

(quotations omitted)). Unless the circumstances fall within certain well-defined exceptions to

mootness, a court cannot entertain a case in which "[t]he controversy between the parties has . . .

clearly ceased to be 'definite and concrete' and no longer 'touches the legal relations of parties

having adverse legal interests.'" <u>DeFunis v Odegaard</u>, 416 U.S. 312, 317 (1974) (quoting <u>Aetna</u>

<u>Life Ins. Co. v. Haworth</u>, 300 U.S. 227, 240–41 (1937) (parentheses omitted)). "The test is

whether a present controversy exists as to which effective relief may be granted." <u>Associacao</u>

<u>Dos Industriais de Cordoaria e Redes v. United States</u>, 17 CIT 754, 759, 828 F. Supp. 978, 984

(1993) ("<u>Cordoaria</u>").

Defendant asserts that Plaintiffs' claims, which Defendant characterizes as seeking the

enforcement of the ITC's Negative Remand Determination, were mooted by implementation of

the Section 129 Determination. Def.'s Mem. 43 ("The section 129 determination provides an

independent basis for the antidumping and countervailing duty orders. Accordingly, even if this Court possessed subject matter jurisdiction and plaintiffs' complaints concerning the retroactive effect of revocation pursuant to a NAFTA panel decision were valid, any decision by this Court concerning those issues would be advisory only."); see also URAA SAA at 1027 ("[I]mplementation of section 129 determinations may render moot all or some issues in pending litigation in connection with the agency's initial determination.").[17] Defendants' argument assumes the very question the court has been called upon to decide – whether the Section 129 Determination could be implemented following the Negative Remand Determination. Consequently, the case is not moot.

### 3.      Statutory Jurisdiction

In addition to constitutional authority, the court must also consider whether it has the statutory authority to hear this case. The court will first consider whether a challenge to the USTR's interpretation of section 129 is within the jurisdiction of the Court of International Trade under 28 U.S.C. § 1581(i)(4). The court will then address whether Congress has authorized a private right of action to bring a suit challenging the USTR's interpretation of section 129. Finally, the court will consider whether foreign governments, such as the Governments of Canada, are "persons" entitled to bring suit in this Court under the APA and 28 U.S.C. § 2631 (2000).

---

[17] Statement of Administrative Action accompanying H.R. Rep. No. 103-826(I), as reprinted in 1994 U.S.C.C.A.N. 4040 ("URAA SAA").

> ### a.      Jurisdiction Under 28 U.S.C. § 1581(i)

Plaintiffs invoke the court's jurisdiction under 28 U.S.C. § 1581(i).[18]  See Tembec Am. &

Supplemental Compl. ¶ 4; CLTA Compl. ¶ 1; Pl.-GOC Compl. ¶ 3.  Congress enacted

§ 1581(i)(4) to ensure that actions involving the "administration and enforcement" of matters

reviewable under other portions of § 1581 did not escape review in this Court.  Cordoaria, 17

CIT at 757, 828 F. Supp. at 982–83 (Congress intended § 1581(i) "to avoid conflict in

jurisdiction with the district courts and to ensure judicial review for various unspecified

challenges to enforcement of import laws.").  Plaintiffs claim that § 1581(i) applies because this

case involves actions taken by the USTR to administer and enforce a determination by the ITC

---

[18] 28 U.S.C. § 1581(i) provides in part:

(i) In addition to the jurisdiction conferred upon the Court of International Trade
by subsections (a)–(h) of this section . . . , the Court of International Trade shall
have exclusive jurisdiction of any civil action commenced against the United
States, its agencies, or its officers, that arises out of any law of the United States
providing for –

   (1) revenue from imports or tonnage;
   (2) tariffs, duties, fees, or other taxes on the importation of merchandise
   for reasons other than the raising of revenue;
   . . . .
   (4) administration and enforcement with respect to the matters referred to
   in paragraphs (1)–(3) of this subsection and subsections (a)–(h) of this
   section.

This subsection shall not confer jurisdiction over an antidumping or
countervailing duty determination which is reviewable either by the Court of
International Trade under section 516A(a) of the Tariff Act of 1930 [19 U.S.C.
§ 1516a(a)] or by a binational panel under article 1904 of the North American
Free Trade Agreement or the United States-Canada Free-Trade Agreement and
section 516A(g) of the Tariff Act of 1930 [19 U.S.C. § 1516a(g)].

28 U.S.C. § 1581(i).

under section 129(a)(4), i.e., a determination subject to review under 28 U.S.C. § 1581(c). Pl.-GOC's Mem. 58 n.35 (arguing that "[t]he Federal Circuit has recognized the distinction between actions challenging a determination reviewable under section 516A of the Tariff Act . . . and actions challenging the administration and enforcement of orders based on such determinations").

Two arguments are advanced as to why § 1581(i) does not apply in this case. First, Defendant-Intervenor claims that once substantive review of the ITC's May 16, 2002 Determination entered the NAFTA review process, the claim ceased to involve review of the administration and enforcement of a "matter" reviewable under § 1581(c). Def.-Int.'s Reply 43 (arguing that court could not review "the 'matter' of the ITC negative remand determination issued pursuant to the NAFTA panel's order" because "this Court could never have had jurisdiction over the action taken by the ITC on remand").[19] Defendant's argument mischaracterizes the nature of Plaintiffs' claims. Plaintiffs do not challenge the administration

---

[19] It may also be argued that because the substantive review of the Section 129 Determination was pursued in the NAFTA process, the court lost § 1581(c) jurisdiction to review the substance of the Section 129 Determination. Consequently, it could be claimed that the Section 129 Determination ceased to be a "matter" subject to review under § 1581(a)–(h) or (i)(1)–(3), thus depriving this court of jurisdiction to review the "administration and enforcement" of the Section 129 Determination under § 1581(i)(4). This argument incorrectly defines the "matter" over which this Court has subject matter jurisdiction under § 1581(i). 28 U.S.C. § 1581(c) provides the court with jurisdiction to review "any civil action commenced under section 516A of the Tariff Act of 1930 [19 U.S.C. § 1516a]." Those matters over which a civil action may be commenced include "[a] determination by the administering authority or the Commission under section 3538 of [19 U.S.C., i.e. a section 129 determination,] concerning a determination under title VII of the Tariff Act of 1930." 19 U.S.C. § 1516a(a)(2)(B)(vii). Thus, the "matter" for purposes of § 1581(i)(4) is not the civil suit challenging a section 129 determination, but a section 129 determination itself. Because the ITC issued the Section 129 Determination, the court has jurisdiction to review the administration and enforcement of that determination regardless of where the substance of the determination is being reviewed.

and enforcement of the Negative Remand Determination. Instead, it is the administration and enforcement of the Section 129 Determination that is challenged. Section 1581(c) only permits suits based on the review of actions listed in 19 U.S.C. § 1516a, which does not include the USTR's interpretation of section 129. See Shinyei Corp. of Am. v. United States, 355 F.3d 1297, 1304–05, 1309 (Fed. Cir. 2004) (granting plaintiff § 1581(i)(4) jurisdiction in action challenging administration and enforcement of results of administrative review); Consol. Bearings Co. v. United States, 348 F.3d 997, 1002 (Fed. Cir. 2003) ("[A]n action challenging Commerce's liquidation instructions is not a challenge to the final results, but a challenge to the 'administration and enforcement' of those final results."). The fact that the Negative Remand Determination may remain in effect if the Section 129 Determination is invalidated does not transform Plaintiffs' challenge to the USTR's interpretation of section 129 into an attempt to enforce a NAFTA report or the Negative Remand Determination.[20]

Defendants make a similar argument, claiming that Plaintiffs cannot bring suit under §1581(i) because they could have received the same remedy in a challenge to the May 22, 2002 Orders under § 1581(c). See Def.'s Mem. 39–40; Def.'s Reply Supp. Mot. to Dismiss & Resp. Pls.' Mot. Summ. J. ("Def.'s Reply") 35 ("[P]laintiffs did not . . . respond to our demonstration that they might have received the same remedy – revocation of the antidumping and countervailing duty orders and refunds of deposited estimated duties – pursuant to a properly

---

[20] Despite Defendant-Intervenor's contentions, Bhullar v. United States does not apply to the present case to deny Plaintiffs section 1581(i) jurisdiction. In that case, the court dismissed plaintiff's suit for lack of subject matter jurisdiction because NAFTA panel review had been requested in lieu of review under § 1581(c). See Bhullar, 27 CIT at __, 259 F. Supp. 2d at 1340–41. Thus, § 1581(i) jurisdiction was not available. There is no NAFTA panel review authority for the issue now before the court.

brought 28 U.S.C. § 1581(c) action challenging the ITC's original 2002 determination."). It is true that "[s]ection 1581(i) jurisdiction may not be invoked when jurisdiction under another subsection of § 1581 is or could have been available, unless the remedy provided under that other subsection would be manifestly inadequate." Norcal/Crosetti Foods, Inc. v. United States, 963 F.2d 356, 359 (Fed. Cir. 1992) (quoting Miller & Co. v. United States, 824 F.2d 961, 963 (Fed. Cir. 1987) (emphasis removed)). This constraint does not mean, however, that Plaintiffs must forego their right to NAFTA panel review of the substance of the May 16, 2002 Determination in order to seek review of a completely separate action taken to administer and enforce the Section 129 Determination.

The facts in Consolidated Bearings, 348 F.3d at 1001, present a similar situation. In that case, an importer challenged under § 1581(i) the wrongful liquidation of its entries at the time-of-entry cash deposit rate, rather than at the rate established by the weighted average of the final results of an administrative review. Id. at 1001. The importer brought an action under the APA and § 1581(i), claiming that Commerce improperly administered the results of the administrative review. Id. at 1002. The defendant moved to dismiss for lack of subject matter jurisdiction, arguing that the plaintiff could have participated in the administrative review and received the same remedy under § 1581(c). Id. Although the importer might have received its sought-after rate had it joined the administrative review, the Federal Circuit nonetheless found § 1581(i) jurisdiction proper. Id. The court focused not on the remedies available under § 1581(c) and (i), but on the distinction between the claims available under § 1581(c), a challenge to the substance of the administrative review, and § 1581(i), a challenge to Commerce's failure to comply with past-practice in applying assessed rates. Id.

In this case, a challenge to the substance of the ITC's Negative Remand Determination, or the substance of the Section 129 Determination for that matter, involves an entirely separate legal claim than is presented here. Like the plaintiff in Consolidated Bearings, Plaintiffs have brought a challenge to the administration and enforcement of a determination, not to the validity of the determination itself. Consequently, the availability of a remedy under § 1581(c) as to the underlying determination does not bar suit under § 1581(i).

### b.      Private Right of Action

The APA provides a waiver of sovereign immunity allowing persons aggrieved by agency action to file suit for relief other than money damages. Under the APA, courts presume a private right of action is available absent "any indication in the statute that the [agency] decision is committed wholly to the discretion of the agency or that review is otherwise precluded." Md. Dep't of Human Res. v. Dep't of Health & Human Servs., 763 F.2d 1441, 1445 (D.C. Cir. 1985) (quoting Bell v. New Jersey, 461 U.S. 773, 778 n.3 (1983)) (quotations omitted); see 5 U.S.C. § 701(a). This presumption may be overcome by a clear indication of Congressional intent to the contrary. See Block v. Cmty. Nutrition Inst., 467 U.S. 340, 350–51 (1984). Defendants argue that Plaintiffs lack a cause of action for two reasons. First, they argue that Congress has clearly barred private suits to enforce the NAFTA or to challenge agency action taken to implement a NAFTA report. See Def.'s Mem. 41; Def.-Int.'s Mem. 18–21. Second, Defendants argue that the terms of the URAA clearly state that no person other than the United States "shall have any cause of action or defense under any of the Uruguay Round Agreements or by virtue of congressional approval of such an agreement." 19 U.S.C. § 3512(c)(1); see also Def.-Int.'s Mem. 22–26.

Defendants are correct that Congress has provided that no private party may sue to enforce implementation of a NAFTA panel report. 19 U.S.C. § 1516a(g)(7)(a) ("Any action taken by the administering authority or the Commission under this paragraph shall not be subject to judicial review . . . ."); § 3312(c)(1) ("No person other than the United States . . . shall have any cause of action or defense under . . . the Agreement or by virtue of congressional approval thereof . . . ."); § 3312(c)(2) (providing that no person other than the United States "may challenge, in any action brought under any provision of law, any action or inaction by any department . . . on the ground that such action or inaction is inconsistent with the Agreement . . . ."). These provisions are irrelevant, however, because Plaintiffs' claims do not arise from the NAFTA. Instead, pursuant to the APA, Plaintiffs contest the USTR's interpretation of section 129, which was passed as part of the URAA. The possibility that the court would find the USTR's order to implement the Section 129 Determination unlawful does not transform Plaintiffs' claims into an effort to enforce the NAFTA or a NAFTA report through the courts. Because this suit arises from the APA and section 129, and not from the NAFTA or by virtue of Congress' approval of the NAFTA, the jurisdictional bars of 19 U.S.C. §§ 1516a(g) and 3312(c) do not apply.

Defendants also argue that Plaintiffs' claims are barred as attempts to enforce the terms of the URAA. See Def.-Int.'s Mem. 22–26. Specifically, § 3512(c)(1) bars federal courts from entertaining "(A) . . . any cause of action or defense under any of the Uruguay Round Agreements or by virtue of congressional approval of such an agreement, or (B) . . . any action brought under any provision of law, [to challenge] any action or inaction by any department . . . of the United States . . . on the ground that such action or inaction is inconsistent with such

agreement." 19 U.S.C. § 3512(c)(1) (emphasis added). Defendants are correct that Plaintiffs'

suit stems from section 129 of the URAA; however, Defendants' argument overlooks a crucial

distinction – section 129 is domestic legislation that implements, but does not approve, the

Uruguay Round Agreements ("URA"). See 19 U.S.C. § 2903(a)(1)(B) (distinguishing between

trade agreements, such as the URA, legislation implementing an agreement, such as the URAA,

and Congressional approval of an agreement).

      An exhaustive opinion recently issued by the court delineates the difference between

"approval" of an agreement and "enactment" of an agreement's implementation act in the

NAFTA context. See Can. Lumber Trade Alliance v. United States, 30 CIT __, __, 425 F.

Supp. 2d 1321, 1361–62 (2006) ("CLTA") ("Given that Congress has demonstrated that it knows

how to refer to implementing legislation, the court cannot conclude that 'approval of the

Agreement' means, or extends to, barring actions under the implementing legislation itself.").

The court finds that the reasoning expressed in CLTA regarding the NAFTA Implementation Act

is directly applicable to the URAA as well. In CLTA, the court found that "approval" of the

NAFTA was accomplished by only a single section of the NAFTA Implementation Act, while

the remainder of that Act does not approve the NAFTA at all. Id. at __, 425 F. Supp. 2d at 1359.

      As in the NAFTA Implementation Act, the URAA contains a single provision that

"approves" the URA. Compare 19 U.S.C. § 3311(a) (approving NAFTA and its accompanying

statement of administrative action), with 19 U.S.C. § 3511(a) (approving URA and its

accompanying statement of administrative action); see also CLTA, 30 CIT at __, 425 F. Supp. 2d

at 1362–63 (discussing ratification through "approval" of NAFTA). The court in CLTA also

found that the nature of the "fast track" trade agreement procedures used to negotiate the

NAFTA demonstrated a distinction between "approval" of the agreement negotiated by the President and passage of the implementing legislation by Congress.[21] CLTA, 30 CIT at __, 425 F. Supp. 2d at 1360–61. The URAA was passed via "fast track" authority, and the same distinction between approval and enactment exists in its legislative history. Compare North American Free Trade Agreement Statement of Administrative Action, H.R. Doc. No. 103-159, at 13–14 (1993) (referring to "[t]he prohibition of a private right of action based on the NAFTA, or on Congressional approval of the agreement in section 101(a)") (emphasis added), with URAA SAA at 676 (referring to "[t]he prohibition of a private right of action based on the Uruguay Round agreements, or on Congressional approval of those agreements in section 101(a)," now codified at § 3511(a)) (emphasis added). Finally, the court in CLTA also noted that a broad reading of "approval" would lead to absurd results in the statutory scheme. CLTA, 30 CIT at __, 425 F. Supp. 2d at 1363. For example, in that case, Defendant-Intervenors would have been prevented from raising § 3312(c)(1)(A) as a bar to judicial review, because that provision is part of the implementing legislation, and no person other than the United States "shall have any cause of action or defense" by virtue of congressional approval of the NAFTA. Id. at __, 425 F. Supp. 2d at 1358 (quoting 19 U.S.C. § 3312(c)(1)(A)) (emphasis altered). Defendant-Intervenors would face an identical problem under § 3512(c)(1)(A), which contains the same limitation on defenses arising from the "approval" of the URA.

---

[21] The court's holding in CLTA was as follows. Under fast track authority, Congress was called upon to "approve" only the terms of the NAFTA itself and the NAFTA SAA, which was submitted by the President. See CLTA 30 CIT at __, 425 F. Supp. 2d at 1360–61. The NAFTA Implementation Act was not "approved," but "enacted." Id. Thus, specific references to approval of the NAFTA were not directed to the enactment of the implementing legislation. Id. The URAA was passed according to similar authority, and similar distinctions between approval and enactment appear in its text and legislative history.

A recent case from the Court of Appeals for the Federal Circuit also impliedly acknowledges the distinction between the "approval" and "implementation" of a treaty. In Former Employees of Quality Fabricating, Inc. v. U.S. Secretary of Labor, 448 F.3d 1351 (Fed. Cir. 2006), the court considered this Court's jurisdiction to review claims brought pursuant to a provision of the NAFTA Implementation Act governing trade adjustment assistance. Id. at 1352–53. The court noted that "the statutes implementing NAFTA vested the Court of International Trade with considerable jurisdiction over litigation arising under NAFTA." Id. at 1355. It also recognized that "19 U.S.C. § 3311 . . . approves the NAFTA with Canada and Mexico, and the SAA proposed to implement the agreement." Id. Implied in this statement is the recognition that "approval" of the NAFTA is accomplished by one section of the NAFTA Implementation Act, 19 U.S.C. § 3311, not the implementing legislation as a whole. It follows logically that the remainder of the statute does not "approve" the NAFTA, but rather "implements" it. Similarly, 19 U.S.C. § 3511(a)(1) "approves" the URA, and the remainder of the statute, including section 129, "implements" the URA. Because § 3512(c) bars actions arising from the URA and Congressional approval thereof, that section does not bar review of actions brought to challenge the USTR's interpretation of section 129, which was enacted to "implement," not to "approve," the URA.

Furthermore, the structure of the URAA is designed to ensure the participation of all interested parties, including parties such as Plaintiffs. Interested parties are entitled to submit comments on a proposed section 129 determination. 19 U.S.C. § 3538(d). Interested parties are entitled to notice of  pending implementation of a section 129 determination. Id. § 3538(c)(2). Interested parties are also entitled to bring suit to challenge the substance of an implemented

section 129 determination. 19 U.S.C. § 1516a(a)(2)(B)(vii) (declaring "determination by the administering authority or the Commission under section 3538 of this title [Section 129] concerning a determination under subtitle IV of this chapter" reviewable by courts). The court will not infer that, despite Congress' clearly expressed intent to promote the participation of interested foreign parties in the section 129 process, it nevertheless intended to preclude review of whether the USTR's order to implement the results of that process is in accordance with law.

Plaintiffs do not challenge the outcome or adoption of any decision stemming from the URA, NAFTA, or Congressional approval of these agreements. Therefore, Plaintiffs may bring their cause of action challenging the USTR's interpretation of section 129.

### c. The Governments of Canada Are Entitled to Bring Suit Under the APA

The Governments of Canada brought their suit pursuant to 28 U.S.C. §§ 1581(i), 2631(i), and the APA. See Pl.-GOC's Mem. 64. Defendants argue that the United States has not waived its sovereign immunity with respect to foreign sovereigns' assertion of claims against it under the APA because foreign sovereigns do not qualify as "persons" under the APA. See Def.'s Mem. 19–22. Section 702 grants a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute" access to federal courts. 5 U.S.C. § 702 (2000) (emphasis added). The APA defines "person" as "an individual, partnership, corporation, association, or public or private organization other than an agency." 5 U.S.C. § 551(2). Defendants believe that the Governments of Canada cannot invoke the APA because traditionally "in common usage, the term 'person' does not include the sovereign, and statutes employing the word are ordinarily construed to exclude it.'" Def.'s Mem. 20 (quoting Will v. Mich. Dep't of State Police, 491 U.S. 58, 64 (1989) (quotations,

citation & brackets omitted)).

Defendant's cited cases all involve the definition of "person" in the context of 42 U.S.C.

§ 1983 (2000) and the Due Process Clause of the U.S. Constitution, not the APA, 28 U.S.C.

§ 1581, or 28 U.S.C. § 2631.  See Def.'s Mem. 20 (citing Will, 491 U.S. at 64; Breard v. Greene,

523 U.S. 371, 378 (1998) (per curiam); Price v. Socialist People's Libyan Arab Jamahiriya, 294

F.3d 82, 97 (D.C. Cir. 2002)).  The definition of "person," however, for purposes of other

statutes is not tied to the logic of civil rights legislation.  Indeed, the definition of "person" is

often defined more broadly than is "person" in the context of § 1983.   The Supreme Court has

noted that

> there is no hard and fast rule of exclusion.  The purpose, the subject matter, the
> context, the legislative history, and the executive interpretation of the statute are
> aids to construction which may indicate an intent, by the use of the term, to bring
> state or nation within the scope of the law.
> . . . .
> Decision is not to be reached by a strict construction of the words of the
> Act, nor by the application of artificial canons of construction.  On the contrary,
> we are to read the statutory language in its ordinary and natural sense, and if
> doubts remain, resolve them in the light, not only of the policy intended to be
> served by the enactment, but, as well, by all other available aids to construction.

United States v. Cooper Corp., 312 U.S. 600, 604–05 (1941) (footnote omitted), superseded by

statute on other grounds, 15 U.S.C. § 15a, as recognized in U.S. Postal Serv. v. Flamingo Indus.

(USA) Ltd., 540 U.S. 736, 745 (2004).  In the context of other statutes, foreign sovereigns have

been found to be "persons."  See, e.g., Pfizer Inc. v. Gov't of India, 434 U.S. 308, 320 (1978).  In

Pfizer, for example, the Supreme Court found that foreign sovereigns are "persons" entitled to

sue under the Sherman and Clayton Acts, 15 U.S.C. §§ 7, 12.  The Court noted that the definition

of persons provided in the statute included "corporations and associations" formed under

domestic and foreign laws.  Id. at 312 n.9.  The Court considered the statute's expansive

remedial purpose and found that a foreign sovereign was a "person." Id. at 313 ("In light of the law's expansive remedial purpose, the Court has not taken a technical or semantic approach in determining who is a 'person' entitled to sue for treble damages.") (citing Cooper, 312 U.S. at 605).

A number of cases have found that the term "person" should be read to include a foreign sovereign for purposes of the APA.[22] In cases litigating Freedom of Information Act requests filed by foreign agencies and sovereigns, courts have generally assumed that such entities are "persons" within the meaning of 5 U.S.C. § 551. See, e.g., Stone v. Exp.-Imp. Bank of U.S., 552 F.2d 132, 136 (5th Cir. 1977); Neal-Cooper Grain Co. v. Kissinger, 385 F. Supp. 769, 776 (D.D.C. 1974). The D.C. Circuit has since cited these cases with approval. Md. Dep't Human Res., 763 F.2d at 1445; but see Doherty v. U.S. Dep't of Justice, 596 F. Supp. 423, 427–28 (S.D.N.Y. 1984) (disagreeing with Neal-Cooper in dicta).

In addition to the general meaning of "person" under the APA, the court finds that the best indication of whether Congress intended for foreign sovereigns to be considered "persons" for purposes of this case lies in the statutes governing who may sue in the Court of International Trade. 28 U.S.C. § 2631(i) governs which parties may bring suit in this Court under 28 U.S.C. § 1581(i) and provides that "[a]ny civil action of which the Court of International Trade has jurisdiction . . . may be commenced in the court by any person adversely affected or aggrieved by the agency action within the meaning of section 702 of title 5." 28 U.S.C. § 2631(i) (emphasis added). Other portions of text from § 2631 illuminate the meaning of "person" within

---

[22] The Governments of Canada argue that the term "person" in the APA context encompasses foreign sovereigns through the term "public organization." See Pl.-GOC's Mem. 67; see also 5 U.S.C. §§ 551(2), 701(b)(2).

the statute. Subsection 2631(j)(1)(B) states that "only an interested party who was a party to the proceedings in connection with which the matter arose may intervene, and such person may intervene as a matter of right." 28 U.S.C. § 2631(j)(1)(B) (emphasis added). "Interested party" and "person" in this subsection share the same antecedent, which indicates that "interested party" and "person" have an identical meaning within the statute.

The history of U.S. international trade law supports this conclusion. For the purposes of administrative law and specific administrative procedures, agencies frequently employ "interested party" as a term of art in trade cases, and the laws governing this Court adopt this convention, while using "person" in other contexts. Thus, a "person" for the purposes of 28 U.S.C. § 2631 includes "the government of a country in which such merchandise is produced or manufactured or from which such merchandise is exported." 19 U.S.C. § 1677(9)(B) (providing definitions for terms within Subtitle IV, Countervailing and Antidumping Duties, of Tariff Act of 1930); see 28 U.S.C. § 2631(k)(1) (giving term "interested party" in 28 U.S.C. § 2631 definition provided in 19 U.S.C. § 1677); see also 19 U.S.C. § 1677(3) (placing "a political subdivision" of foreign country within definition of "foreign country"); cf. CLTA, 30 CIT at __, 425 F. Supp. 2d at 1355 n.32 (noting intent of Congress to allow foreign governments to commence actions in this Court); H.R. Rep. No. 96-1235, at 28 (emphasizing Congressional intent to "enlarge[ ] the class of persons eligible to sue in civil actions in the Court of International Trade to include . . . foreign governments"). This definition indicates that the Governments of Canada have standing to pursue this case. Consequently, the Court has the power to provide relief that may redress the alleged injuries of all Plaintiffs in the suit.

**B.     Prudential Limitations**

**1.     The Zone of Interests**

In addition to demonstrating standing under Article III, Plaintiffs also bear the burden of showing that their "complaint[s] . . . fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." See McKinney, 799 F.2d at 1551 (citations & quotations omitted); see also Air Courier Conference of Am. v. Am. Postal Workers Union, 498 U.S. 517, 523–24 (1991). "In the administrative context, [the zone of interests aspect] is derived from the requirement of section 702 of the APA that a plaintiff challenging agency action must be 'adversely affected or aggrieved.'" Sacilor, Acieries et Laminoirs de Lorraine v. United States, 815 F.2d 1488, 1491 (Fed. Cir. 1987) (citing 5 U.S.C. § 702). For this test, the court need only determine that the complainant's interest is "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970) (emphasis added). Specifically, the court must "first discern the interests 'arguably . . . to be protected' by the statutory provision at issue [and] then inquire whether the plaintiff's interests affected by the agency action in question are among them." Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co., 522 U.S. 479, 492 (1998) (ellipses in original).

**a.     The Interests Arguably Protected by the Statutory Provision at Issue**

Defendant argues that "[f]oreign governments and producers are . . . outside the 'zone of interest' intended to be protected by section 129" because "section 129 creates only procedures for the Political Branches to consult with each other in order to frame the United States' response to adverse WTO reports." Def.'s Mem. 18 (citing URAA SAA at 1022); Def.-Int.'s Reply

15–17. According to Defendant, only the U.S. Government falls within the applicable "zone of interests" because section 129 establishes a procedure for administrative actions following WTO panel reports to bring U.S. actions into compliance with those rulings. Within this context, Congress provided "for interested party participation only for the ITC's proceedings upon the merits, section 129(d), and judicial review only for implemented determinations." Def.'s Reply 4; Def.-Int.'s Mem. 28–29. Thus, Defendants invite the court to read narrowly the provisions of 19 U.S.C. § 3538 and find arguable interests only where Congress has specifically provided a statutory right to participate in the administrative process.

Defendants' argument focuses on the procedural rights created by section 129, but misses the proper object of inquiry – the substantive interests to be protected by those procedural rights. See Int'l Bhd. of Teamsters v. Pena, 17 F.3d 1478, 1484 (D.C. Cir. 1994) (finding that prudential standing to challenge agency failure to comply with notice and comment requirements depends on nature of "substantive authority" of agency in question). The Supreme Court instructs the courts to consider "the overall context" of the relevant statutory framework in deciding which interests are arguably protected. Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 401 (1987) (stating that court is "not limited to considering the statute under which respondents sued, but may consider any provision that helps us to understand Congress' overall purposes in the [relevant act]"). Section 129 does indeed impose an obligation on the ITC to allow interested parties to provide comments on a proposed section 129 determination. 19 U.S.C. § 3538(d). It provides a right to be notified once a section 129 determination is implemented. Id. § 3538(c)(2). It also provides a right to seek judicial review of a section 129 determination, if it is implemented. 19 U.S.C. § 1516a(a)(2)(B)(vii). The substantive purpose of these procedural rights, however, is

to ensure, once the USTR has ordered the ITC to make a determination under section 129, that

such determination "is in accord with U.S. safeguards, antidumping, or countervailing duty law."

URAA SAA at 1023, 1022 (stating that section 129 is "a mechanism that permits the agencies

concerned . . . to issue a second determination, where such action is appropriate, to respond to

the recommendations in a WTO panel or Appellate Body report") (emphasis added).  The

possibility that interested parties will suffer under an unlawful AD or CVD order is the

substantive interest that Plaintiffs argue is within the zone of interests protected in section 129.

Thus, section 129 is intended not only to provide the USTR with authority to order new

determinations to comply with adverse WTO reports, but also to ensure that those determinations

are made in accordance with U.S. law.  The procedural interest of participating in the section 129

process cannot be divorced from the substantive interest such participation arguably protects –

ensuring that new section 129 determinations are implemented in accordance with U.S. law.[23]

---

[23]  Defendants' comparison of this case with Sacilor is inapposite.  That case involved a
challenge to Commerce's steel quota short supply determination under the Steel Import
Stabilization Act, Pub. L. No. 98-573, Title VIII, § 801 et seq., 99 Stat. 2948 (1984), which was
passed for the express purpose of limiting steel imports from the European Economic
Community.  815 F.2d at 1489.  Because the statute was designed to protect domestic producers
of steel products, the court found that "it would be contrary to the entire purpose of the Act to
allow foreign producers to challenge a decision made pursuant to a regulatory scheme designed
to protect American steel producers from foreign imports."  Id. at 1491.  The Federal Circuit in
Sacilor examined the legislative history to conclude that Congress did not "intend[] to rely on
foreign manufacturers to challenge administrative application of American import laws."  Id.
Section 129 is intended to ensure that implemented section 129 determinations are made in
accordance with Title VII, while also complying with the United States' WTO obligations.  See
URAA SAA at 1023.  Likewise, Title VII's purpose is not solely to protect domestic industry,
but rather to "regulate the level of competition between foreign and domestic producers."
CLTA, 30 CIT at __, 425 F. Supp. 2d at 1353; see also Fed. Mogul Corp. v. United States, 63
F.3d 1572, 1580 (Fed. Cir. 1995) ("It is well established that antidumping law is not intended to
be punitive. Antidumping jurisprudence seeks to be fair, rather than to build bias into the
calculation of dumping margins.").  Globe Metallurgical, Inc. v. United States, 28 CIT __, __,
350 F. Supp. 2d 1148, 1157 (2004) ("The goal of the [antidumping] statute is not punitive; the

      **b.**      **Whether Plaintiffs' Interests Affected by the USTR's Actions Are Among the Interests Protected by Section 129**

Private plaintiffs, as producers, exporters, and importers, have an interest in the proper administration of 19 U.S.C. § 3538. First, they are "interested parties" as defined in 19 U.S.C. § 1677(9)(A). As they were and are subject to U.S. antidumping and countervailing duties, they have a protected interest in the proper administration of section 129. See 19 U.S.C. § 3538(c)(1), (d). Plaintiffs' interest in not having antidumping and countervailing duties imposed is directly connected to the proper administration of section 129 and, therefore, falls "arguably within the zone of interests to be protected or regulated [by section 129]." Data Processing, 397 U.S. at 153.

Likewise, the Canadian Governments' interests are regulated by section 129, as Congress intended foreign governments to be "interested parties" for the purposes of this section. See 19 U.S.C. § 1677(9). The Governments of Canada claim that they were aggrieved by Commerce's and the ITC's actions within the meaning of 28 U.S.C. § 2631(i), specifically that Defendants' administrative actions harmed their economies and tax revenues. See Data Processing, 397 U.S. at 154 (stating that interest to be protected "at times, may reflect . . . economic values."). The Supreme Court has held that "[h]istory associates the word 'aggrieved' with a congressional intent to cast the standing net broadly – beyond the common-law interests and substantive statutory rights upon which 'prudential' standing traditionally rested." Fed. Election Comm'n v. Akins, 524 U.S. 11, 19 (1998). Therefore, the Governments of Canada also meet the zone of

---

goal is to level the playing field for United States producers of similar goods with producers in [a foreign] country."); Allied Tube & Conduit Corp. v. United States, 24 CIT 1357, 1370, 127 F. Supp. 2d 207, 218 (2000) (finding that "fair and equitable" calculation of antidumping duties is "crucial" to purpose of antidumping law).

interests requirement.  See Clarke, 479 U.S. at 399–400 (stating that zone of interests test only

"denies a right of review if the plaintiff's interests are so marginally related to or inconsistent

with the purposes implicit in the statute" and that "there need be no indication of congressional

purpose to benefit the would-be plaintiff").  Thus, the court thus finds no prudential standing

restraints that bar Plaintiffs' claims in this matter.

>    **2.      Foreign Affairs and the Political Question Doctrine**

The court must also consider whether the issue before it is a political question committed

the discretion of a coordinate political branch.  Courts refer to six factors identified in  Baker v.

Carr to determine whether an issue should be deemed a nonjusticiable "political question."  369

U.S. 186, 217 (1962).  These factors are:

> [1] a textually demonstrable constitutional commitment of the issue to a
> coordinate political department; or [2] a lack of judicially discoverable and
> manageable standards for resolving it; or [3] the impossibility of deciding without
> an initial policy determination of a kind clearly for nonjudicial discretion; or [4]
> the impossibility of a court's undertaking independent resolution without
> expressing lack of the respect due coordinate branches of government; or [5] an
> unusual need for unquestioning adherence to a political decision already made; or
> [6] the potentiality of embarrassment from multifarious pronouncements by
> various departments on one question.

Bancoult v. McNamara, 445 F.3d 427, 432 (D.C. Cir. 2006) (quoting Baker, 369 U.S. at 217).

Any one of these factors may be sufficient to render an inquiry a political question, "but 'unless

one of these formulations is inextricable from the case at bar,' we may not dismiss the claims as

nonjusticiable under the political question doctrine."  Id. at 432–33 (quoting Baker, 369 U.S. at

217).  This case implicates none of these concerns.

First, this is manifestly not a case involving the "textual commitment" of the given

subject matter to a coordinate branch of government.  The USTR, as part of the Executive Office

of the President, undoubtedly has a role in the creation and management of U.S. trade policy.

See Fed. Mogul, 63 F.3d at 1581 ("Trade policy is an increasingly important aspect of foreign

policy, an area in which the executive branch is traditionally accorded considerable deference.").

Nevertheless, Congress also possesses some constitutional authority to regulate trade with

foreign nations. U.S. Const. art. I, § 8, cl. 3. In the context of section 129, Congress has

intentionally instituted a system of checks and balances, requiring the USTR to consult with

Congress, see 19 U.S.C. § 3538(a)(3) and (5), and giving the ITC, an independent agency,

authority to decide whether it may, under Title VII, take steps to comply with an adverse WTO

report, see id. § 3538(a)(1). See Fed. Mogul Corp., 63 F.3d at 1581–82 (noting ITC's role as

check on USTR's ability to implement WTO determinations through section 129 process,

thereby dampening influence of "political concerns" on policy). Given this division of

constitutional and statutory authority, the court finds that there is no demonstrable textual

commitment of the interpretation of section 129 to the political branches.

Moreover, this case clearly presents issues susceptible to judicial analysis and review.

The court is called upon to interpret the scope of authority conferred on the USTR by statute.

There is no lack of judicially manageable standards to be used in interpreting a delegation of

power from Congress to an executive agency. See FDA v. Brown & Williamson Tobacco Corp.,

529 U.S. 120, 132–35 (2000) (interpreting authority of FDA to regulate cigarettes under

agency's organic statute); DKT Mem'l Fund, Ltd. v. Agency for Int'l Dev., 810 F.2d 1236, 1238

(D.C. Cir. 1987) ("[W]hereas attacks on foreign policymaking are nonjusticiable, claims alleging

non-compliance with the law are justiciable, even though the limited review that the court

undertakes may have an effect on foreign affairs."). As discussed above, this case fundamentally

concerns the authority of the USTR under section 129(a) – a question of domestic administrative and trade law that lies within this Court's subject matter jurisdiction.[24]

Consideration of the USTR's authority to order implementation of affirmative section 129(a) determinations does not depend on the court's evaluation of the wisdom of a given implementation. The court is neither called upon to make trade policy, nor to direct the USTR as to whether any section 129 determination should be implemented. Rather, the court is merely asked to determine the bounds of the USTR's authority to order implementation. Cf. Population Inst. v. McPherson, 797 F.2d 1062, 1067 (D.C. Cir. 1986) (finding agency's interpretation of statute restricting USAID funding for family planning programs operating in nations where forced abortion or sterilization occurs was justiciable because "the correctness of the [agency's] interpretation of the amendment appeared to be a simple question of statutory construction that a court was competent to examine").

Furthermore, resolution of this case does not present a lack of respect for, or a need for unquestioning adherence to, the views of the executive, or the possibility of embarrassment from multifarious statements from the U.S. Government. In the context of international trade law, courts frequently find agency determinations inconsistent with U.S. law or unsupported by substantial evidence. Indeed, the court is required by statute to invalidate such actions, regardless of the potential for "embarrassment." See 19 U.S.C. § 1516a(b)(1) (requiring court to deem certain agency actions unlawful if unsupported by substantial evidence or "arbitrary,

_____

[24] Because this case deals with domestic law and not the international obligations of the United States, Corus Staal BV does not apply as Defendants contend. See Corus Staal BV v. U.S. Dep't of Commerce, 395 F.3d 1343, 1349 (Fed. Cir. 2005) (citing need of courts to grant "substantial deference" to Executive decisions regarding WTO enforcement because of foreign policy implications).

capricious, an abuse of discretion, or otherwise not in accordance with law"). Given this obligation, the court also finds that reviewing the scope of authority delegated to the USTR under section 129 would not show a "lack of respect" that would implicate the political question doctrine. Finally, this court has been instructed <u>not</u> to exercise unquestioning support for executive agencies in interpreting international trade law. <u>Fed. Mogul Corp.</u>, 63 F.3d at 1581 (noting that foreign affairs aspect of trade law does not grant "Commerce . . . unlimited discretion . . . or [allow] courts [to] unthinkingly defer to the Government's view of Congressional enactments"). Consequently, the court finds that it has the power to hear Plaintiffs' claims and that no prudential concerns limit the court's jurisdiction.

### III. Statutory Analysis

Having resolved the question of jurisdiction, the court now turns to the merits of Plaintiffs' claims. The issue before the court is a relatively narrow question of statutory interpretation: whether Congress has granted the USTR authority, pursuant to section 129, to order anything other than the total or partial revocation of an AD, CVD, or safeguards order following a determination by the ITC under section 129(a)(4). For the reasons stated below, the court finds that section 129 cannot be read to imply authority for the USTR to order the implementation of a section 129(a) determination that does not result in at least partial revocation of a related AD, CVD, or safeguards order. Therefore, the court finds that Plaintiffs are entitled to judgment as a matter of law, insofar as the USTR did not have legal authority to order Commerce to "implement" the Section 129 Determination.

**A.      The WTO Dispute Settlement System**

Although the legal question presented to the court for decision is narrow, the legal

context necessary to understand that question is somewhat elaborate. For clarity's sake, the

court will provide a brief overview of AD and CVD duty orders, and the forms of review to

which they are subject.

Commerce and the ITC are authorized to conduct investigations and impose AD and

CVD duties on imported goods under Title VII of the Tariff Act of 1930, as amended. See 19

U.S.C. §§ 1671, 1673 et seq. These laws, and the regulations implementing them, provide a

series of standards to be applied in determining whether, and to what extent, AD and CVD

orders may be imposed under U.S. law. Determinations under Title VII may be reviewed by the

U.S. courts, or, if the goods in question are of Mexican or Canadian origin, by a NAFTA

binational panel. See 19 U.S.C. § 1516a(a)(2)(B), (g)(2). Additionally, by virtue of the United

States' membership in the WTO and its accession to the Antidumping and Subsidies agreements,

the United States has agreed to certain international standards governing the imposition of AD

and CVD orders. These obligations are separate from those imposed by U.S. law under Title

VII. Thus, the same AD or CVD order may be subject to challenge under either set of

obligations. Challenges to an AD or CVD order under the WTO agreements occur through

international arbitration under the DSU. Challenges to an AD or CVD order as inconsistent with

U.S. law may be brought before this Court, or, where the case involves Canada or Mexico,

before a NAFTA binational panel. The binational panel sits in the place of a U.S. court,

interpreting U.S. law according to U.S. standards of review. See NAFTA art. 1904.2.

Ordinarily, when this Court or a NAFTA panel finds that a given AD or CVD order is

inconsistent with U.S. law, the court or NAFTA panel issues a ruling remanding the

determination to Commerce or the ITC. Commerce and the ITC are obligated to act on these

remands by issuing new determinations "not inconsistent" with the findings of the court or

NAFTA panel.[25]

Unlike litigation before the court or a NAFTA panel, WTO Members are not required

automatically to comply with the recommendations of a WTO panel or the AB. While

compliance is encouraged, the DSU contemplates three different responses to an adverse WTO

panel report. See URAA SAA at 1008–09. A Member may elect to bring its domestic practices

in line with the WTO's recommendations. Id. at 1009. Alternatively, Members may substitute a

compensatory trade agreement that lowers other barriers to trade while leaving an objectionable

practice in place. Id. Finally, a Member may choose not to comply with the WTO's

recommendation. Id. When there is a dispute over a Member's compliance with an adverse

report, Article 21.5 of the DSU provides for the formation of an arbitration panel to determine

whether a Member has taken measures to comply with a final report. See DSU art. 21.5. If the

Article 21.5 panel finds that a Member has not taken measures to comply with an adopted WTO

report, the panel may authorize a suspension of trade concessions at a value "equivalent to" the

nullification of trade benefits caused by the practice in question. See DSU art. 22.

Congress fashioned section 129 to allow the United States to take full advantage of its

remedial options before the WTO.[26] Rather than require the ITC or Commerce automatically to

---

[25] For NAFTA panel reports, the obligation to issue a new determination is found at 19 U.S.C. § 1516a(g)(7).

[26] Section 129(a), as codified at 19 U.S.C. § 3538(a), provides:

implement an adverse WTO recommendation, Congress granted the USTR authority to decide

(1) Advisory report

If a dispute settlement panel finds in an interim report under Article 15 of the Dispute Settlement Understanding, or the Appellate Body finds in a report under Article 17 of that Understanding, that an action by the International Trade Commission in connection with a particular proceeding is not in conformity with the obligations of the United States under the Antidumping Agreement, the Safeguards Agreement, or the Agreement on Subsidies and Countervailing Measures, the Trade Representative may request the Commission to issue an advisory report on whether title VII of the Tariff Act of 1930 [19 U.S.C. 1671 et seq.] or title II of the Trade Act of 1974 [19 U.S.C. 2251 et seq.], as the case may be, permits the Commission to take steps in connection with the particular proceeding that would render its action not inconsistent with the findings of the panel or the Appellate Body concerning those obligations.  The Trade Representative shall notify the congressional committees of such request.
. . . .

(3) Consultations on request for Commission determination

If a majority of the Commissioners issues an affirmative report under paragraph (1), the Trade Representative shall consult with the congressional committees concerning the matter.

(4) Commission determination

Notwithstanding any provision of the Tariff Act of 1930 [19 U.S.C. 1202 et seq.] or title II of the Trade Act of 1974 [19 U.S.C. 2251 et seq.], if a majority of the Commissioners issues an affirmative report under paragraph (1), the Commission, upon the written request of the Trade Representative, shall issue a determination in connection with the particular proceeding that would render the Commission's action described in paragraph (1) not inconsistent with the findings of the panel or Appellate Body. The Commission shall issue its determination not later than 120 days after the request from the Trade Representative is made.

(5) Consultations on implementation of Commission determination

The Trade Representative shall consult with the congressional committees before the Commission's determination under paragraph (4) is implemented.

(6) Revocation of order

If, by virtue of the Commission's determination under paragraph (4), an antidumping or countervailing duty order with respect to some or all of the imports that are subject to the action of the Commission described in paragraph (1) is no longer supported by an affirmative Commission determination under title VII of the Tariff Act of 1930 [19 U.S.C. 1671 et seq.] or this subsection, the Trade Representative may, after consulting with the congressional committees under paragraph (5), direct the administering authority to revoke the antidumping or countervailing duty order in whole or in part.

19 U.S.C. § 3538(a).

whether the United States will undertake to comply with its WTO obligations, and, if so, whether that response will be through agency action. See URAA SAA at 1022 ("Section 129 of the implementing bill establishes a procedure by which the Administration may obtain advice it requires to determine its response to an adverse WTO panel or Appellate Body report concerning U.S. obligations under the Agreement on Safeguards, Antidumping, or Subsidies and Countervailing Measures.").

Section 129 describes a step-by-step process to be taken in response to an adverse WTO report. It is divided into two subsections, 129(a), which governs determinations by the ITC, and 129(b), which governs determinations by Commerce. See 19 U.S.C. § 3538(a), (b). Under subsection (a), following an adverse recommendation from a WTO panel or the AB concerning an ITC determination, the USTR may request an advisory report from the ITC. Id. § 3538(a)(1). The advisory report states whether a majority of the ITC commissioners believe that it is possible for the ITC to take steps to comply with the WTO's recommendation, consistent with Title VII of the Tariff Act of 1930 and Title II of the Trade Act of 1979.[27] Id. This advisory report does not provide the ITC's reasoning supporting its conclusion, nor does it state whether a new determination would be affirmative or negative.

If the ITC's subsection (a)(1) report finds that action may be taken consistent with Title VII to bring the challenged determination into compliance with the adverse report, the USTR

---

[27] As mentioned, Title VII of the Tariff Act of 1930 governs antidumping and countervailing duties under 19 U.S.C. § 1671 et seq. Title II of the Trade Act of 1979 governs safeguards under 19 U.S.C. § 2251 et seq.

must then consult with designated congressional committees.[28]  Id. § 3538(a)(3).  Following

these consultations, the USTR may ask the ITC to issue a determination that would render its

action "not inconsistent" with the WTO panel's or AB's recommendation.  Id. § 3538(a)(4).  The

ITC must then  "decide independently on the steps it will take to render its actions 'not

inconsistent with' the panel or Appellate Body findings."  URAA SAA at 1024.  To accomplish

this, section 129 allows the ITC to revisit its determinations, reopen the record, and conduct

additional analysis.  See URAA SAA at 1024 (allowing 120 days to "provide the ITC sufficient

time to gather additional information if necessary for it to decide on appropriate implementing

action").  Interested parties are provided notice and opportunity to comment on the

determination.  Id. § 3538(d).  The ITC's new determination must be issued within 120 days

after the USTR's request.  Id. § 3538(a)(4).

    After the ITC's report is issued, but before it is implemented, the USTR must again

consult with the congressional committees.  Id. § 3538(a)(5).  Finally, subsection (a)(6) provides

that "[i]f, by virtue of the [ITC's] determination . . . an antidumping or countervailing duty order

with respect to some or all of the imports . . . is no longer supported by an affirmative

Commission determination" the USTR may "direct the administering authority to revoke the

antidumping or countervailing duty order in whole or in part."  Id. § 3538(a)(6).

    Revocation is effective on the date the USTR directs Commerce to revoke an order

pursuant to paragraph (6) of section 129.[29]  Id. § 3538(c)(1)(A).  Commerce must publish notice

---

    [28]  The relevant congressional committees are the House Ways and Means Committee
and the Senate Committee on Finance.  URAA SAA at 1023.

    [29]  Section 129(c)(1), codified at 19 U.S.C. § 3538(c)(1), provides:

of implementation of any determination made under section 129 with respect to Title VII of the

Tariff Act of 1930.  Id. § 3538(c)(2)(A).  Finally, section 129(e) provides for judicial or

binational panel review of implemented section 129 determinations.  19 U.S.C. §

1516a(a)(2)(B)(vii); URAA SAA at 1026.  The section 129 determination also may be subject to

review before a WTO panel as a "measure taken to comply" with an adverse WTO report.  See

DSU art. 21.5.  If an Article 21.5 panel issues an adverse recommendation in response to a

section 129 determination, the process is repeated.

The dispute in this case centers around the meaning of section 129(a)(6) and the powers

Congress delegated to the USTR to order implementation of section 129(a) determinations.  The

parties offer two competing interpretations.  Plaintiffs assert that the plain language of section

129(a) gives the USTR only the authority to order Commerce to revoke some or all of an order

in response to a section 129(a) determination.  Pl.-GOC's Mem. 18; Pl.-CLTA's Mem. 25.

Plaintiffs contend further that the purpose and structure of section 129 militate against an

---

(c) Effects of determinations; notice of implementation
    (1)  Effects of determinations
        Determinations concerning title VII of the Tariff Act of 1930 [19 U.S.C. 1671 et seq.] that are implemented under this section shall apply with respect to unliquidated entries of the subject merchandise (as defined in section 771 of that Act [19 U.S.C. 1677]) that are entered, or withdrawn from warehouse, for consumption on or after –
            (A) in the case of a determination by the Commission under subsection (a)(4) of this section, the date on which the Trade Representative directs the administering authority under subsection (a)(6) of this section to revoke an order pursuant to that determination, and
            (B) in the case of determination by the administering authority under subsection (b)(2) of this section, the date on which the Trade Representative directs the administering authority under subsection (b)(4) of this section to implement that determination.

19 U.S.C. § 3538(c)(1)

interpretation implying additional authority for the USTR to order implementation of "affirmative" section 129(a) determinations.[30]  Defendants argue that the authority of the USTR to order Commerce to implement affirmative section 129(a) determinations is necessarily implied in the language and purpose of the statute.  Def.'s Mem. 24; Def.-Int.'s Mem. 32.

The court begins with the familiar rules governing statutory interpretation.  The court must first decide whether Congress has spoken to the precise question presented, i.e., whether the USTR has the authority to order Commerce to implement an affirmative section 129(a) determination.  Nippon Steel Corp. v. United States, 337 F.3d 1373, 1380 (Fed. Cir. 2003) ("'If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'") (quoting Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–43 (1984)).  In deciding whether Congress plainly intended to delegate authority to the USTR, "a reviewing court should not confine itself to examining a particular statutory provision in isolation.  The meaning – or ambiguity – of certain words or phrases may only become evident when placed in context."  Brown & Williamson, 529 U.S. at 132.  This context includes legislative history and canons of statutory construction if the text of the statute is unclear.  See Delverde, SrL v. United States, 202 F.3d 1360, 1363 (Fed. Cir. 2000) (employing "the traditional tools of statutory construction," including "the statute's text, structure, and legislative history, and . . . relevant

---

[30]  Because Congress has clearly provided for the USTR to order implementation of a "negative" section 129(a) determination through complete or partial revocation of an outstanding AD or CVD order, the parties and the court have confined their discussion to "affirmative section 129 determinations."  The court uses the term "affirmative section 129 determination" to refer to any section 129 determination that cannot be implemented through total or partial revocation of an existing AD, CVD or safeguards order.

canons of interpretation" before resorting to deference under <u>Chevron</u>); <u>Natural Res. Def.</u>

<u>Council, Inc. v. Browner</u>, 57 F.3d 1122, 1125 (D.C. Cir. 1995) (courts "must first exhaust the

traditional tools of statutory construction to determine whether Congress has spoken to the

precise question at issue") (quotation omitted).  Finally, the court must "interpret the statute as a

symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious

whole," while making allowances for "common sense as to the manner in which Congress is

likely to delegate a policy decision of [significant] economic and political magnitude to an

administrative agency."  <u>Brown & Williamson</u>, 529 U.S. at 133 (citations & quotations omitted).

**B.      Section 129(a) Does Not Authorize the USTR to Order Implementation of an
         Affirmative Section 129(a) Determination**

**1.      The Text of Section 129(a)(6)**

As with any case involving statutory interpretation, the court begins with the text of the

statute in question.  Section 129(a)(6) provides:

> (6) Revocation of order
>
> If, by virtue of the Commission's determination under paragraph (4), an
> antidumping or countervailing duty order with respect to some or all of the
> imports that are subject to the action of the Commission described in paragraph
> (1) is no longer supported by an affirmative Commission determination under title
> VII of the Tariff Act of 1930 . . . or this subsection, the Trade Representative
> may, after consulting with the congressional committees under paragraph (5),
> direct the administering authority <u>to revoke</u> the antidumping or countervailing
> duty order in whole or in part.

19 U.S.C. § 3538(a)(6) (emphasis added).

Subsection (a)(6) provides for the revocation of an order that "is no longer supported by

an affirmative Commission determination" – the situation that results after the ITC issues a

negative determination.  Conspicuously absent from the text of section 129(a)(6) is any mention

of "implementation" of an affirmative determination that does not withdraw support for an existing order. In other words, the text of subsection (a)(6) permits the USTR to order revocation only where the ITC's section 129 determination withdraws analytical support for some or all of the order in question. See 19 U.S.C. § 3538(a)(6) (permitting revocation only "[i]f, by virtue of the Commission's determination under paragraph (4)," an order "is no longer supported by an affirmative Commission determination"). The text of paragraph (6) is silent regarding the opposite situation, where an order remains entirely supported by virtue of the ITC's new analysis under section 129(a)(4). The legislative history also states that "[s]ubsection (a)(6) provides authority for Commerce to revoke an order under Title VII in whole or in part to implement an ITC determination under subsection (a)(4)." URAA SAA at 1024. Like the statute, the URAA SAA makes no mention of any action other than full or partial revocation that the USTR may order "to implement" the ITC's determination under subsection (a)(4).

Moreover, paragraph (6) is entitled "[r]evocation of order." While a statutory heading is not controlling in the presence of conflicting statutory text, the court is not barred from using the heading as an interpretive guide when the meaning of the text in question is uncertain. See INS v. Nat'l Ctr. for Immigrants' Rights, Inc., 502 U.S. 183, 189 (1991) ("[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text."); see also Doe v. GTE Corp., 347 F.3d 655, 660 (7th Cir. 2003) (noting that "a statute's caption must yield to its text when the two conflict," but implying this rule does not apply when the question is "whether there is a conflict"). Here, use of the term "revocation" in the heading corresponds with the use of the term "revocation" in the text of section 129(a)(6), further indicating that the power delegated to the USTR is confined to ordering "revocation," not "implementation," of a new affirmative

determination.

The statutory text of paragraph (6) therefore supports Plaintiffs' contention that Congress did not intend to give the USTR authority to order Commerce to implement an affirmative section 129(a) determination. In a detailed statutory scheme such as this, the absence of authorization militates against implying additional powers not mentioned in the text. See FAG Italia S.p.A. v. United States, 291 F.3d 806, 816 (Fed. Cir. 2002) ("[T]he absence of an express statutory provision cannot be interpreted as giving an agency authority . . . ."); Ethyl Corp. v. EPA, 51 F.3d 1053, 1060 (D.C. Cir. 1995) ("Were courts to presume a delegation of power absent an express withholding of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with Chevron and quite likely with the Constitution as well.").

## 2.    Comparison with the Parallel Provisions of Section 129(b) and (c)

In determining whether Congress has spoken to the precise question at issue, the court also compares the provisions of section 129(a) with similar provisions in the statute. See US W. Commc'ns, Inc. v. Hamilton, 224 F.3d 1049, 1053 (9th Cir. 2000) (where two statutory provisions "were enacted at the same time and form part of the same Act, the duty to harmonize them is particularly acute"). Section 129(b) provides a procedure to implement adverse WTO recommendations concerning determinations by Commerce, rather than by the ITC, in AD, CVD, and safeguards cases. 19 U.S.C. § 3538(b). The procedure established under section 129(b) is similar to that of section 129(a) in many respects. Like subsections (a)(1) and (a)(3), subsection (b)(1) orders the USTR to consult with Commerce and the relevant congressional committees after receiving an adverse recommendation from the WTO. Id. § 3538(b)(1). Like

subsection (a)(4), subsection (b)(2) requires Commerce to issue a determination "not inconsistent" with the findings of an adverse WTO recommendation following an order from the USTR.  Id. § 3538(b)(2).  Upon issuance of that report, the USTR consults again with Congress under subsection (b)(3), just as in (a)(5).  The similarity, however, ends there.  While (a)(6) refers only to "revocation of order," (b)(4) expressly grants the USTR authority to "direct the administering authority to implement, in whole or in part, the determination made under [subsection (b)(2)]."  Id. § 3538(b)(4) (emphasis added).

The text of section 129(b) demonstrates two things.  First, it shows that Congress was aware of a difference between the relatively broad authority to order "implementation" and comparatively narrow authority to order "revocation" of section 129 determinations.  Second, it shows that Congress gave the USTR authority to order Commerce to "implement" section 129(b) determinations, but chose not to use the same language in the context of section 129(a) determinations.  Comparison of these two adjacent and simultaneously enacted provisions strongly suggests that Congress' choice of the word "revocation" was not accidental, but was consciously intended to limit the USTR's authority to order implementation under section 129(a) – a limitation that Congress did not provide for in section 129(b).  See Sosa v. Alvarez-Machain, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.") (citation & quotation omitted); Clay v. United States, 537 U.S. 522, 528 (2003) ("When 'Congress includes particular language in one section of a statute but omits it in another section of the same Act,' we have recognized, 'it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (quoting Russello v. United States, 464

U.S. 16, 23 (1983)).

The reason that Congress used "revocation" in subsection (a)(6), but "implemented" in (b)(4), is tied to the different functions performed by Commerce and the ITC. In antidumping cases, Commerce determines not only whether sales are made at less than fair value, but also how much below fair value those sales actually are. See 19 U.S.C. § 1673b(d) (preliminary determinations of estimated weighted dumping margin); id. § 1673d(c)(1)(B) (final determination of estimated weighted dumping margin).[31] Commerce will therefore often have to adjust an antidumping or countervailing duty order to reflect changes in a subsidy rate or dumping margin even if its determination under section 129(b) remains affirmative. See, e.g., Antidumping Measures on Certain Softwood Lumber Products from Canada, 70 Fed. Reg. 22,636, 22,645 (Dep't Commerce May 2, 2005) (notice of determination under section 129 of the Uruguay Round Agreements Act) (adjusting margins in response to section 129(b) determination); Stainless Steel Plate in Coils from the Republic of Korea, 66 Fed. Reg. 45,279, 45,283 (Dep't Commerce Aug. 28, 2001) (notice of amendment of final antidumping duty

---

[31] 19 U.S.C. § 1677(35)(A) defines the term dumping margin as "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." Subsection (35)(B) defines the term "weighted average dumping margin" as the "percentage determined by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer."

Commerce performs a similar function with respect to countervailing duties. See 19 U.S.C. § 1671b(d) (preliminary determination of subsidy rate); id. § 1671d(c)(1)(B) (final determination of subsidy rate). A countervailable subsidy is described in 19 U.S.C. § 1677(5)(B) as one in which an authority provides a financial contribution to a person and a benefit is thereby conferred. The statute defines "financial contribution" as "(i) the direct transfer of funds . . . (ii) foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income, (iii) providing goods or services, other than general infrastructure, or (iv) purchasing goods." Id. § 1677(5)(D).

determinations of sales at less than fair value) (same). Congress gave the USTR authority to order implementation of an affirmative determination by Commerce because a section 129(b) determination might change the margins used in the resulting antidumping or countervailing duty order. By contrast, the ITC issues a "yes-or-no" determination as to whether the domestic industry is subject to injury or a threat of injury. See 19 U.S.C. § 1671d(b), (c)(2); § 1673d(b), (c)(2). The ITC does not make margin calculations as Commerce does, and an affirmative section 129(a) determination, such as the Section 129 Determination in this case, has no effect on the order it supports. Because ITC determinations do not involve the changes in margins made by section 129(b) determinations, Congress saw no need to give the USTR authority to order implementation of an affirmative section 129(a) determination.

An examination of the legislative history of section 129 supports the conclusion that Congress intended that implementation of an affirmative determination would occur only if it resulted in a change in the order that it supports. Even though the USTR has authority to order implementation of affirmative section 129(b) determinations, the URAA SAA is careful to point out that:

> The Trade Representative may decline to request implementation of the second [section 129(b)] determination. This might be the case, for example, if Commerce issued a final affirmative subsidy determination and a WTO panel subsequently finds that Commerce's analysis was not consistent with the Subsidies Agreement. On making a new determination at the Trade Representative's direction, Commerce could correct the analytical flaw found by the panel without changing the original outcome. In such a case, there would be no need to implement the new determination as a matter of domestic law.

URAA SAA at 1025 (emphasis added). Thus, it is clear that only those determinations that have a substantive effect on the order that they support require implementation. If a section 129(b) determination has no effect on an order, Congress saw no need for implementation. Id.

Likewise, Congress knew that an affirmative determination by the ITC, following an adverse

WTO proceeding, would have no effect on an existing order, leaving no reason for the USTR to

have the power to order implementation of an affirmative section 129(a) determination.

The text of section 129(c) reinforces the dichotomy between "revocation" under section

129(a) and "implementation" under section 129(b).  In section 129(c), Congress provided

effective dates for section 129 determinations.  19 U.S.C. § 3538(c).  Section 129(b)

determinations take effect for all entries made after "the date on which the Trade Representative

directs the administering authority under subsection (b)(4) of this section to implement that

determination."  Id. § 3538(c)(1)(B) (emphasis added).  By contrast, "in the case of a

determination by the Commission under subsection (a)(4) of this section," the determination

takes effect after "the date on which the Trade Representative directs the administering authority

under subsection (a)(6) of this section to revoke an order pursuant to that determination."

Id. § 3538(c)(1)(A) (emphasis added).  Once again, Congress consciously chose to use the term

"implement" in reference to a determination from Commerce under section 129(b), but used only

the term "revoke" in reference to the determination from the ITC under section 129(a).  As

discussed, the explanation for this difference lies in the different nature of section 129(a) and

129(b) determinations.  Congress made clear in the URAA SAA that a determination that has no

effect on an order need not be implemented.  Because an affirmative section 129(a)

determination would have no effect on an order, it does not require domestic implementation.

Therefore, Congress did not find it necessary to provide an effective date for an unimplemented

determination in section 129(c).[32]

### 3.     The Purpose of Section 129

Finally, the court must also consider the purpose of the statute in evaluating Congress'

intent in fashioning the law.  This includes a consideration of whether "common sense" suggests

that Congress would have chosen to delegate a significant amount of authority through

implication.  See Brown & Williamson, 529 U.S. at 133; cf. Whitman v. Am. Trucking Ass'ns,

Inc., 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a

regulatory scheme in vague terms or ancillary provisions – it does not, one might say, hide

elephants in mouseholes.").  As mentioned, the purpose of section 129 is to provide a means "by

which the Administration may obtain advice it requires to determine its response to an adverse

WTO panel or Appellate Body report concerning U.S. obligations under the Agreement on

Safeguards, Antidumping, or Subsidies and Countervailing Measures."  URAA SAA at 1022

(emphasis added).  Because section 129 only applies where the United States has lost before the

WTO, Congress expected that adoption of WTO recommendations with respect to an ITC

determination would result in determinations revoking all or part of an existing order, if

---

[32] Defendant-Intervenor argues that an affirmative section 129(a) determination does not need an express effective date because it has no effect on an underlying order.  Def.-Int.'s Reply 28–29.  At oral argument, Defendant offered a similar position, stating that the USTR may, in its discretion, order an affirmative determination to be effective "as of the date of the original order."  Oral Arg. Tr. 66:17–18, 76:5–21, Apr. 4, 2006.  This interpretation is inconsistent with the terms of the statute.  Congress expressly provided an effective date for affirmative section 129(b) determinations that are implemented.  19 U.S.C. § 3538(c)(1)(B).  It is unclear why Congress would provide a prospective effective date for implemented affirmative section 129(b) determinations, but leave the effective date for implemented affirmative section 129(a) determinations subject to the USTR's discretion.  The more straightforward explanation is that Congress did not explicitly provide an effective date for implemented affirmative section 129(a) determinations because it did not foresee a need for implementation.

implementation were necessary at all. Because such an ITC determination could always be implemented through revocation, Congress saw no need to delegate authority to order implementation of an affirmative section 129(a) determination.

**C.      The Defendants' Arguments Do Not Show that Congress Intended to Imply Additional Authority for the USTR in Section 129**

Although the plain text of section 129(a) does not mention the USTR's authority to order implementation of affirmative section 129(a) determinations, Defendants offer the following arguments, based on portions of statutory text and the purpose of the statute, in favor of their interpretation implying such authority into the terms of section 129. The court addresses each in turn.

**1.      Use of the Term "Supported" in Section 129(a)(6)**

Defendants argue that the presence of the phrase "no longer supported . . . under . . . this subsection" in subsection (a)(6) demonstrates that Congress implied the USTR's power to order implementation of affirmative section 129(a) determinations. Def.-Int.'s Reply 27–28 ("Plaintiffs' interpretation of Section 129(a) makes superfluous the language of subsection (a)(6) that provides that USTR may revoke an order if it 'is no longer supported' by an affirmative Title VII determination or an affirmative Section 129(a)(4) determination, because in order for an affirmative Section 129(a)(4) determination to have effect under domestic law such that it 'supports' an order, it must be implemented.") This argument is based on the following logic. Section 129(a)(6) identifies two ways in which a new section 129(a)(4) determination may lead to revocation: (i) by undermining a determination under Title VII of the Tariff Act of 1930 that supports the existing order; or (ii) by undermining a determination "under . . . this subsection" that supports the existing order. See 19 U.S.C. § 3538(a)(6). "Under this subsection" refers to a

determination under section 129(a)(4), which implies that a prior section 129(a)(4) determination "supported" the order in question. The prior section 129 determination could only have "supported" an order if it were implemented. Thus, argue Defendants, Congress must have intended for the USTR to order implementation of affirmative section 129(a) determinations. Def.'s Mem. 27; Def.-Int.'s Mem. 36.

Defendants' argument makes one critical assumption – that a section 129(a)(4) determination that "supports" an existing order must have been an "affirmative" determination. Defendants fail to consider that the first section 129 determination may result in a <u>partial revocation</u> of the original Title VII order. There is no dispute that the USTR has authority to order implementation through a partial revocation. <u>See</u> 19 U.S.C. § 3538(a)(6). After the USTR orders implementation of a section 129(a)(4) determination through partial revocation of an existing order, the remaining portion of that order would then be "supported" by the ITC's first section 129(a) determination. A second section 129(a) determination could then result in total or partial revocation of that order, in which case it would also need to be implemented. This explains how an existing order may be "supported" by a section 129(a)(4) determination without it necessarily being "affirmative."[33]

Given the wording of the statute, which discusses only revocation and partial revocation, the court finds that Congress used the phrase "no longer supported . . . under . . . this subsection" to provide for a situation involving an intervening partial revocation of an order, not the

---

[33] This also provides an explanation of why Congress refers to the possibility of NAFTA panel review of a section 129 determination. Foreign parties may choose to challenge a section 129 determination that results in only partial revocation, rather than total revocation, of an AD or CVD order. In such circumstances, a foreign party could exercise its right to challenge an implemented partial negative determination before a NAFTA panel, rather than this Court.

implementation of an affirmative section 129(a) determination. Therefore, there is no need to

imply additional authority for the USTR to order implementation of an affirmative section 129(a)

determination to account for the phrase "under . . . this subsection" in section 129(a)(6).

### 2.     Use of the Term "Implemented" in Section 129(a)(5)

Defendants raise an argument supporting their interpretation of section 129(a) based on

the text of subsection (a)(5). They note that subsection (a)(5) requires the USTR to consult with

Congress before an ITC determination under section 129(a)(4) is "implemented." 19 U.S.C.

§ 3538(a)(5) ("The Trade Representative shall consult with the congressional committees before

the Commission's determination under paragraph (4) is implemented."). Defendants argue that

the court must find some purpose for the broader term "implemented" used in section 129(a)(5),

beyond the power to "revoke" mentioned in (a)(6).[34] Plaintiffs contend that subsection (a)(5) is

merely a "procedural requirement" and that the cross-reference between subsections (a)(6) and

(a)(5) suggests that the two be read consistently, not disparately. Pl.-GOC's Mem. 28 n.6.

The fact that Congress used the term "implemented" should be given some meaning, if

possible, though the court should not strain to abide by the surplusage canon if it leads to an

interpretation inconsistent with the remainder of the statutory scheme. See Chickasaw Nation v.

United States, 534 U.S. 84, 94 (2001) (stating that the canon requiring a court to give effect to

each word if possible "is sometimes offset by the canon that permits a court to reject words 'as

surplusage' if . . . 'repugnant to the rest of the statute'") (quoting K. Llewellyn, The Common

---

[34] Essentially, Defendants suggest that had Congress not intended to grant the USTR authority to order implementation of affirmative section 129(a) determinations, it could have simply written section 129(a)(5) to read: "The Trade Representative shall consult with the congressional committees before ordering revocation of an antidumping or countervailing duty order pursuant to a Commission determination under paragraph (4)."

Law Tradition 525 (1960)).

It is evident from the statutory text that subsections (a)(5) and (b)(3) were intended to

emphasize that regardless of the agency in question, the USTR must consult with Congress

before ordering Commerce to take action on a section 129 determination.  Congress' attempt to

create procedural uniformity does not, however, demonstrate that the powers delegated to the

USTR under subsections (a) and (b) must also be uniform in substance.  Indeed, Congress'

choice of wording in subsections (a), (b) and (c) shows that Congress intended to differentiate

the authority delegated to the USTR under section 129(a) and (b).  Given Congress' careful use

of the term "implemented" and "revoke," a procedural rule limiting when the USTR may

exercise its authority to order revocation of an AD or CVD order should not be used to expand

the powers listed in section 129(a) beyond what Congress delegated in the first place.

Furthermore, giving additional meaning to "implemented" in subsection (a)(5) would

bring ambiguity into otherwise straightforward statutory text, for all of the reasons indicated.

The Supreme Court has cautioned against abandoning a plain reading of a statute for an

ambiguous one solely to accommodate an extra word.  See Lamie v. U.S. Tr., 540 U.S. 526, 536

(2004) (acknowledging that Court's interpretation of a statute rendered the term "attorney"

surplusage, but finding that "[w]here there are two ways to read the text – either attorney is

surplusage, in which case the text is plain; or attorney is non-surplusage . . . , in which case the

text is ambiguous – applying the rule against surplusage is, absent other indications,

inappropriate").  Following the Supreme Court's advice, the court "prefer[s] the plain meaning

since that approach respects the words of Congress."  Id.

**3.      Whether Failure to Implement Affirmative Section 129(a) Determinations Would Put the United States in Violation of Its WTO Obligations**

Defendant-Intervenor argues that Congress must have intended for the USTR to direct implementation of affirmative section 129(a) determinations in order to comply with the Antidumping Agreement's requirement to provide judicial review of all "final determinations and reviews of determinations." Antidumping Agreement art. 13. Section 129(e) only provides for "review by the courts and NAFTA binational panels of new Title VII determinations made by Commerce or the ITC under section 129 that are implemented." URAA SAA at 1026 (emphasis added). Thus, argues Defendant-Intervenor, implementation of affirmative section 129(a) determinations is necessary to allow the United States to fulfill its WTO obligation to provide domestic judicial review.

This argument fails for two reasons. First, there is no indication that the WTO would construe the definition of "final determination" or "reviews of determinations" under Article 13 to include a section 129 determination. The court will refrain from attempting to divine what gloss the WTO might place on Article 13 in some future report. This is especially so where, as here, neither the AB nor a WTO panel has ruled on the meaning of the Article 13.[35]

Second, and more importantly, Congress clearly has stated that it does not intend to provide judicial review for some affirmative determinations. The URAA SAA states that "[s]ection 129 determinations that are not implemented will not be subject to judicial or

---

[35] See Legal Affairs Division, World Trade Organization, WTO Analytical Index: Guide to WTO Law and Practice 759 (2003), available at http://www.wto.org/english/res_e/booksp_e/analytic_index_e/anti_dumping_e.htm (last visited July 20, 2006) (noting that there is "[n]o jurisprudence or decision of a competent WTO body" regarding Article 13 of the Antidumping Agreement).

binational panel review, because such determinations will not have any effect under domestic law." URAA SAA at 1026. Because Congress has made clear that the USTR need not order implementation of Commerce determinations that merely "correct an analytical flaw . . . without changing the original outcome," id. at 1025, it is also clear that Congress did not intend for all section 129 determinations to be eligible for judicial review.

Although it is a well-established canon of statutory construction that "[a]bsent express Congressional language to the contrary, statutes should not be interpreted to conflict with international obligations," Luigi Bormioli Corp. v. United States, 304 F.3d 1362, 1368 (Fed. Cir. 2002) (quoting Federal Mogul Corp., 63 F.3d at 1581), that principle does not apply here. The court finds that the statements contained in the URAA SAA, which are authoritative as to the meaning of the URAA, express a clear intent to deny judicial review to unimplemented determinations, even if that is later held to be inconsistent with Article 13 of the Antidumping Agreement. See 19 U.S.C. § 3512(d) ("The statement of administrative action approved by the Congress under section 3511(a) . . . shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding . . . ."). Had Congress intended for the USTR to implement all section 129 determinations in order to comply with Article 13, it would not have invited the USTR to do otherwise in the URAA SAA.

Defendant makes a variant of the same argument, suggesting that even if Congress does not always require implementation "as a matter of domestic law," Congress nonetheless did intend to allow implementation of affirmative section 129(a) determinations as a matter of "international law." Def.'s Mem. 33–34. The AB has stated that "[i]n principle, a measure

which has been 'taken to comply with the recommendations and rulings' of the [Dispute

Settlement Body ("DSB")] will <u>not</u> be the same measure as the measure which was the subject of

the original dispute . . . . [but will be] the 'measures taken to comply' . . . adopted to <u>implement</u>

those recommendations and rulings." Appellate Body Report, <u>Canada – Measures Affecting the</u>

<u>Export of Civilian Aircraft – Recouse to Article 21.5 of the DSU</u>, ¶ 36, WT/DS70/AB/RW (July

21, 2000) (footnote omitted). Defendant argues that the United States may be found to be in

violation of its WTO obligations if the USTR is not given authority to order implementation of

an affirmative section 129(a) determination. Def.'s Mem. 32–33.

Defendant buttresses this argument with a negative inference from the legislative history.

As noted, the <u>URAA</u> <u>SAA</u> provides that in certain circumstances Commerce would not need to

"implement" a section 129(b) determination where "Commerce could correct [an] analytical flaw

found by the panel without changing the original outcome. In such a case, there would be no

need to implement the new determination as a matter of <u>domestic</u> law." <u>URAA</u> <u>SAA</u> at 1025

(emphasis added). By referring only to domestic law, Defendant argues that Congress must have

intended to allow the USTR to implement affirmative section 129(a) determinations "as a matter

of <u>international</u> law." Def.'s Mem. 33.

As with Defendant-Intervenor's argument under Article 13 of the Antidumping

Agreement, Defendant's argument rests on a hypothetical – the WTO may one day impose a

requirement on the United States to formally "implement" all section 129 determinations,

regardless of their effect on an existing order. In actuality, the WTO has not emphasized the

importance of any official sanction given to a section 129 determination. The Article 21.5 panel

that considered the ITC's Section 129 Determination in this proceeding focused directly on the

ITC's determination. See Panel Report, United States – Investigation of the International Trade Commission in Softwood Lumber from Canada – Recourse to Article 21.5 of the DSU by Canada, WT/DS277/RW (Nov. 15, 2005). It considered how the ITC "fill[ed] the gaps" identified by the original WTO Panel report by providing "additional explanation and evidence in support of its conclusions." Id. at ¶ 7.11. It even went so far as to say that "what is most important for our analysis is the reasoning and explanation of the [ITC] in its section 129 determination." Id. at ¶ 7.12. If the WTO were to interpret the Antidumping Agreement to require the formal "implementation" of all section 129 determinations, Congress might change section 129 or its implementing regulations to conform with this requirement, but such "implementation" might take a different form and would not govern this action in any event. See 19 U.S.C. § 3533(g). Additionally, to the extent Defendant's argument rests on an inference that Congress intended to grant a power to order implementation as a matter of "international law" based on an explicit refusal to require implementation as a matter of "domestic law," it is disfavored. See FAG Italia S.p.A., 291 F.3d at 816; Ethyl Corp., 51 F.3d at 1060. In sum, it is not for the court to ascribe to Congress an unstated intent to allow the USTR to order implementation of an affirmative section 129(a) determination based on conjecture regarding future events in the WTO.

####    4.    Changes from Findings of Material Injury to Threat of Material Injury

Defendant asserts that Congress must have intended to grant the USTR the authority to order implementation of affirmative section 129(a) determinations in cases where the ITC's injury determination under section 129 finds only a threat of material injury, following a preliminary determination of present material injury. Oral Arg. Tr. 67:7–19. Where the ITC

finds only a threat of material injury in a final determination, Commerce may be required to

refund cash deposits collected after issuance of a preliminary affirmative dumping determination

from Commerce.[36]  19 U.S.C. §§ 1671e(b)(2), 1673e(b)(2).  Without implementation of the

ITC's order, Defendant argues, the threat finding would have no domestic legal effect and could

not result in a refund required under sections 1671e(b)(2) and 1673e(b)(2).

This argument is subject to two objections.  First, Congress has emphasized that relief

under section 129 is prospective only.  URAA SAA at 1026 ("Consistent with the principle that

GATT panel recommendations apply only prospectively, subsection 129(c)(1) provides that

where determinations by the ITC or Commerce are implemented under subsections (a) or (b),

such determinations have prospective effect only.").  A refund of cash deposits might be

construed as a form of retrospective relief unavailable under section 129.  No court has

addressed this issue.  The court therefore hesitates to decide whether retrospective relief in the

form of refunds of cash deposits would be available following issuance of a section 129(a)

determination finding a threat of material injury after a prior present injury finding is rejected.

Assuming, arguendo, that such a refund would be available, the court finds that the

USTR's power to direct revocation of an order under section 129(a)(6) would be sufficient to

---

[36]  Commerce may keep cash deposits collected after a preliminary affirmative dumping determination under two circumstances.  First, it may keep deposits collected if the ITC finds in its final determination that a domestic industry is materially injured by reason of foreign imports. Second, Commerce may keep the cash deposits if the ITC finds a threat of material injury that would have been a present material injury "but for" the suspension of liquidation under 19 U.S.C. §§ 1671b(d)(1) and 1673b(d)(1).  If neither of these is the case, then 19 U.S.C. §§ 1671e(b)(2) and 1673e(b)(2) require Commerce to order Customs to release any bond or security, and to refund any cash deposits taken for merchandise entered, or withdrawn from warehouse, for consumption prior to the entry of the ITC's threat determination.  See, e.g., Sulfanilic Acid from India, 58 Fed. Reg. 12,026, 12,027 (Dep't Commerce Mar. 2, 1993) (countervailing duty order).

fulfill this obligation. The USTR has authority to order Commerce to "revoke the antidumping or countervailing duty order in whole <u>or in part</u>." 19 U.S.C. § 3538(a)(6) (emphasis added). If a refund of cash deposits is necessary in response to an ITC determination, the USTR could order Commerce to revoke the AD or CVD order insofar as it directed, or led to directions to, Customs to hold deposits collected during the investigation period. In its AD and CVD orders, Commerce often implies, but sometimes explicitly states, that it is ordering collection of deposits consistent with the "general rule" of sections 1671e(b)(1) or 1673e(b)(1). <u>See, e.g.</u>, <u>Glycine from the People's Republic of China</u>, 60 Fed. Reg. 16,116 (Dep't Commerce Mar. 29, 1995) (antidumping duty order) (finding that section 1673e(b)(1) applies and ordering assessment of duties on all entries made after "the date on which the Department published its preliminary determination notice in the Federal Register"). In response to a change from present injury to threat, Commerce could implement that determination by revoking the portion of the outstanding order requiring retention of cash deposits collected during the investigation period. The fact that Customs usually assumes that it will apply the "general rule" unless instructed otherwise does not mean that this implied order cannot be revoked.

Defendant claims that implementation of the threat of injury finding would be necessary to refund the cash deposits held by Customs, but a refund is precisely what a revocation would accomplish. The court finds that the USTR possesses the authority it requires to comply with sections 1671e(b)(2) and 1673e(b)(2) under the express terms of section 129(a)(6), making it unnecessary to imply an authority for the USTR to direct implementation of affirmative section 129 determinations.

     5.       **Analytical Changes Related to Sunset and Changed Circumstances Reviews**

Defendant also argues that affirmative section 129 determinations must be implemented

to allow the ITC to comply with its obligations in subsequent proceedings under U.S. law. Oral

Arg. Tr. 74:19–75:4. For instance, while a change in the definition of "like product" and the

domestic industry in a section 129 determination might not lead to a change in the original

antidumping or countervailing duty order, the ITC may have to revisit that determination in a

changed circumstances or sunset review under 19 U.S.C. §§ 1675(b) and (c) (2000).[37] See 19

U.S.C. § 1675a(a)(1) (the ITC must "take into account . . . its prior injury determinations,

including the . . . impact of imports of the subject merchandise on the industry."). Defendant

argues that a failure to implement an affirmative section 129(a) determination would prevent the

ITC from performing this statutory obligation.

Defendant's argument assumes that a determination must be implemented, i.e., used to

support an AD or CVD order, before its analysis may be considered by the ITC. There is

nothing in the law suggesting that analysis used in a determination that does not result in a

change in a published antidumping order cannot be considered under § 1675a(a)(1). The

purpose behind § 1675a(a)(1) is to ensure that the ITC reviews all of the information available to

it in a sunset or changed circumstances review, especially information obtained prior to

imposition of an AD or CVD order or with respect to such period. URAA SAA at 884 ("This

---

[37] Before determining whether a domestic industry is faced with material injury or a threat of material injury, the ITC must first determine the scope of the "domestic industry" by defining the "like product" under investigation. Having defined the domestic like product, it becomes possible to determine the scope of the domestic industry injured by foreign imports. 19 U.S.C. § 1677(4)(A), (10). Although the ITC must accept Commerce's determination as to the scope of the imported merchandise that is subject to investigation, the ITC determines what domestic products are like the imported product Commerce has identified.

consideration is important, because this period is the most recent time during which imports of subject merchandise competed in the U.S. market free of the discipline of an order or agreement."). Likewise, the provision allowing the ITC to review confidentially submitted information from previous determinations speaks of information gathered during investigations and makes no mention of implemented or unimplemented determinations. Id. ("Section 226(a)(1) of the bill amends section 777(b)(1) of the Act [19 U.S.C. § 1677f(b)(1)(A)] to expressly allow proprietary information submitted in connection with an investigation or review to be used by the agency to which the information originally was submitted in a changed circumstances or sunset review . . . involving the same subject merchandise."). There is nothing in the statute suggesting that a section 129 determination must be "implemented" before the ITC may consider a new mode of analysis or review information gathered in a section 129 analysis in complying with section 1675a(a)(1).

**D.     Tembec's Timing Argument**

Tembec argues that the May 22, 2002 Orders ceased to exist, effective November 4, 2004, upon the dismissal of the United States' challenge to the NAFTA panel determination and thus, on December 20, 2004, there was nothing for Commerce to amend. Because the court has reached the conclusion, based on other grounds, that the USTR's order to implement the Section 129 Determination was not authorized by statute, the court does not reach this argument.

## V.   Conclusion

The court concludes that no question of material fact exists as to its jurisdiction to hear

this case, or the right of Plaintiffs to bring their claims under the APA, and that the court has

jurisdiction in this matter.  Further, the court grants Plaintiffs' motions for summary judgment in

part, and holds as follows:

1)  section 129 does not grant the USTR authority to order Commerce to implement affirmative

section 129(a) determinations;

2)  the USTR's order to Commerce to implement the Section 129(a) Determination was <u>ultra</u>

<u>vires</u> and void; and

3)  the May 22, 2002 Orders are not supported by an affirmative finding of injury.

Further proceedings on remedies will be addressed in a separate order.


                                                              /s/ Jane A. Restani
                                                        Jane A. Restani, Chief Judge



                                                              /s/ Judith M. Barzilay
                                                        Judith M. Barzilay, Judge



Dated this 21st day July, 2006                          /s/ Richard K. Eaton
          New York, N.Y.                                   Richard K. Eaton, Judge

## APPENDIX A

April 2, 2001: Commerce and the ITC received petitions to initiate AD/CVD investigations. See Softwood Lumber from Canada, 66 Fed. Reg. 18,508 (Int'l Trade Comm'n Apr. 9, 2001) (institution of countervailing duty and antidumping investigations and scheduling of preliminary phase investigations).

Aug 17, 2001: Commerce issued its preliminary determination that countervailable subsidies were being provided to producers of certain softwood lumber products from Canada. Certain Softwood Lumber Products from Canada, 66 Fed. Reg. 43,186 (Dep't Commerce Aug. 17, 2001) (notice of preliminary affirmative countervailing duty determination, preliminary affirmative critical circumstances determination, and alignment of final countervailing duty determination with final antidumping duty determination).

Nov. 6, 2001: Commerce issued its preliminary determination that softwood lumber from Canada was being sold, or was likely to be sold, at less than fair value. Certain Softwood Lumber Products from Canada, 66 Fed. Reg. 56,062 (Dep't Commerce Nov. 6, 2001) (notice of preliminary determination of sales at less than fair value and postponement of final determination).

Apr. 2, 2002: Commerce issued its final affirmative determinations regarding dumping and subsidization. See Certain Softwood Lumber Products from Canada, 67 Fed. Reg. 15,539 (Dep't Commerce Apr. 2, 2002) (notice of final determination of sales at less than fair value); Certain Softwood Lumber Products from Canada, 67 Fed. Reg. 15,545 (Dep't Commerce Apr. 2, 2002) (notice of final affirmative countervailing duty determination and final negative critical circumstances determination).

May 16, 2002: The ITC published its final affirmative threat of injury determination, which states
that United States industry was threatened with material injury by reason of subject imports. See Softwood Lumber from Canada, Inv. Nos. 701-TA-414, 731-TA-928 (Final), USITC Pub. 3509 (May 2002).

May 22, 2002: Commerce issued AD and CVD orders. See Certain Softwood Lumber Products from Canada, 67 Fed. Reg. 36,068 (Dep't Commerce May 22, 2002) (notice of amended final determination of sales at less than fair value and notice of antidumping duty order); Certain Softwood Lumber Products from Canada, 67 Fed. Reg. 36,070 (Dep't Commerce May 22, 2002) (notice of amended final affirmative countervailing duty determination and notice of countervailing duty order).

June 20, 2002: Canadian parties filed a Request for a NAFTA Panel to review the ITC affirmative threat of injury determination. See North American Free-Trade Agreement, Article 1904 NAFTA Panel Reviews, 67 Fed. Reg. 41,955 (Dep't Commerce June 20, 2002) (notice of request for panel review).

April 2003:      Canada requested dispute resolution at the WTO, challenging the ITC's affirmative threat determination as inconsistent with the United States' legal obligations under the WTO Antidumping and Subsidies agreements.

Sept. 5, 2003:  The NAFTA panel found the ITC affirmative threat of injury determination not supported by record evidence and remanded it to the ITC. See In the Matter of Certain Softwood Lumber Products from Canada, USA-CDA-2002-1904-07, Panel Decision (Sept. 5, 2003).

Mar. 22, 2004: The WTO panel found the ITC affirmative threat of injury determination to be in violation of the WTO Antidumping Agreement. See Panel Report, United States – Investigation of the International Trade Commission in Softwood Lumber from Canada, WT/DS277/R (Mar. 22, 2004).

Apr. 19, 2004: The NAFTA panel found the ITC's revised affirmative threat of injury determination unsupported by record evidence and again remanded it to the ITC. See In the Matter of Certain Softwood Lumber Products from Canada, USA-CDA-2002-1904-07, Remand Decision (Apr. 19, 2004).

Apr. 26, 2004: The WTO Dispute Settlement Body adopted the WTO Panel's March 22, 2004, report.

June 14, 2004: Pursuant to section 129 (a)(1), the USTR requested that the ITC determine whether it may, consistent with Title VII, take steps to comply with the WTO Panel's adverse report. See Letter from Robert B. Zoellick, USTR, to Deanna T. Okun, Chairman, ITC (June 14, 2004) AR 2.

July 14, 2004: The ITC issued an affirmative advisory report in response to the USTR's inquiry pursuant to section 129(a)(1) as to whether the ITC could comply with the WTO's findings. See Letter from Stephen Koplan, Chairman, ITC, to Robert B. Zoellick, USTR (July 14, 2004) AR 3.

July 27, 2004: Pursuant to section 129(a)(4), the USTR asked the ITC to issue a new determination not inconsistent with the WTO panel's findings. See Letter from Robert B. Zoellick, USTR, to Stephen Koplan, Chairman, ITC (July 27, 2004), AR 4.

Aug. 31, 2004: The NAFTA panel again found the revised ITC affirmative threat of injury determination unsupported by record evidence and directed the ITC to issue a

determination consistent with the panel's decision that the record evidence did not support an affirmative finding of a threat of material injury. See In the Matter of Certain Softwood Lumber Products from Canada, USA-CDA-2002-1904-07, Remand Decision (Aug. 31, 2004).

Sept. 10, 2004: In response to the NAFTA panel, the ITC issued a negative threat of injury determination. See Certain Softwood Lumber from Canada, Inv. Nos. 701-TA-414, 731-TA-928 (Final) (Third Remand), USITC Pub. 3815, Views on Remand (Sept. 10, 2004).

Oct. 12, 2004: The NAFTA panel affirmed the ITC Negative Remand Determination. See Certain Softwood Lumber Products from Canada, 69 Fed. Reg. 69,584, 69,585 (Dep't Commerce Nov. 30, 2004) (NAFTA panel decision).

Oct. 25, 2004: The NAFTA Secretariat issued a Notice of Final Panel Action. See Certain Softwood Lumber Products from Canada, 69 Fed. Reg. 69,584, 69,585 (Dep't Commerce Nov. 30, 2004) (NAFTA panel decision)

Nov. 4, 2004: The Timken Notice issued by Commerce on November 30, 2004, see infra, to give legal effect to the ITC's negative injury determination retroactively took effect and suspended liquidation of entries entered on or after November 4, 2004.

Nov. 24, 2004: The United States filed a request for a NAFTA Extraordinary Challenge Committee to contest the NAFTA panel decisions. See Certain Softwood Lumber Products from Canada, 69 Fed. Reg. 70,235 (Dep't Commerce Dec. 3, 2004) (notice of request for Extraordinary Challenge Committee).

In response to the USTR's July 27, 2004, Section 129 request, the ITC issued an affirmative threat of material injury determination. See Softwood Lumber from Canada, Inv. Nos. 701-TA-414, 731-TA-928 (Final), Section 129 Determination (Nov. 24, 2004) AR 5.

Nov. 30, 2004: Commerce issued a Timken Notice in the Federal Register to implement retroactively to November 4, 2004, the ITC negative injury determination resulting from the NAFTA panel's Third Remand. See Antidumping and Countervailing Duty Investigations of Certain Softwood Lumber Products from Canada, 69 Fed. Reg. 69,584 (Dep't of Commerce Nov. 30, 2004) (notice of NAFTA Panel decision).

Dec. 10, 2004 The USTR directed Commerce to "effectuate th[e] implementation [of the affirmative Section 129 Determination] by amending the antidumping and countervailing duty orders on softwood lumber products from Canada." Letter from Robert B. Zoellick, USTR, to Donald Evans, Sec'y, Dep't Commerce (Dec. 10, 2004), AR 6.

Dec. 20, 2004: Commerce published an "Amendment to Orders" that "affirm[ed] the Commission's original determination that . . . the industry in the United States producing softwood lumber products is threatened with material injury by reason of imports of the subject merchandise from Canada." Certain Softwood Lumber Products from Canada, 69 Fed. Reg. 75,916 (Dep't Commerce Dec. 20, 2004) (amendment to antidumping and countervailing duty orders).

Aug. 10, 2005: The NAFTA ECC unanimously dismissed the United States challenge and upheld the NAFTA panel decision affirming the ITC negative remand determination. See In the Matter of Certain Softwood Lumber Products from Canada, ECC-2004-1904-01-USA, Opinion and Order of the ECC (Aug. 10, 2005).

Aug. 16, 2005: The NAFTA Secretariat published notice of the ECC decision. See North American Free-Trade Agreement, Article 1904 NAFTA Panel Reviews, 70 Fed. Reg. 48,103 (Dep't Commerce Aug. 16, 2005) (notice of decision and completion of Extraordinary Challenge Committee).

Nov. 15, 2005: The Article 21.5 arbitration panel upholds the Section 129 Determination as consistent with the United States' WTO obligations. Panel Report, United States – Investigation of the International Trade Commission in Softwood Lumber from Canada – Recourse to Article 21.5 of the DSU by Canada, WT/DS277/RW (Nov. 15, 2005).

**APPENDIX B**

Section 129(a) and (b), as codified at 19 U.S.C. § 3538(a), provides:

(a)    Action by United States International Trade Commission

   (1) Advisory report
      If a dispute settlement panel finds in an interim report under Article 15 of the Dispute Settlement Understanding, or the Appellate Body finds in a report under Article 17 of that Understanding, that an action by the International Trade Commission in connection with a particular proceeding is not in conformity with the obligations of the United States under the Antidumping Agreement, the Safeguards Agreement, or the Agreement on Subsidies and Countervailing Measures, the Trade Representative may request the Commission to issue an advisory report on whether title VII of the Tariff Act of 1930 [19 U.S.C. 1671 et seq.] or title II of the Trade Act of 1974 [19 U.S.C. 2251 et seq.], as the case may be, permits the Commission to take steps in connection with the particular proceeding that would render its action not inconsistent with the findings of the panel or the Appellate Body concerning those obligations. The Trade Representative shall notify the congressional committees of such request.
   (2) Time limits for report
      The Commission shall transmit its report under paragraph (1) to the Trade Representative –
         (A)    in the case of an interim report described in paragraph (1), within 30 calendar days after the Trade Representative requests the report; and
         (B)    in the case of a report of the Appellate Body, within 21 calendar days after the Trade Representative requests the report.
   (3) Consultations on request for Commission determination
      If a majority of the Commissioners issues an affirmative report under paragraph (1), the Trade representative shall consult with the congressional committees concerning the matter.
   (4) Commission determination
      Notwithstanding any provision of the Tariff Act of 1930 [19 U.S.C.1202 et seq.] or title II of the Trade Act of 1974 [19 U.S.C. 2251 et seq.], if a majority of the Commissioners issues an affirmative report under paragraph (1), the Commission, upon the written request of the Trade Representative, shall issue a determination in connection with the particular proceeding that would render the Commission's action described in paragraph (1) not inconsistent with the findings of the panel or Appellate Body.  The Commission shall issue its determination not later than 120 days after the request from the Trade Representative is made.
   (5) Consultations on implementation of Commission determination
      The Trade Representative shall consult with the congressional committees before the Commission's determination under paragraph (4) is implemented.
   (6) Revocation of order

If, by virtue of the Commission's determination under paragraph (4), an antidumping or countervailing duty order with respect to some or all of the imports that are subject to the action of the Commission described in paragraph (1) is no longer supported by an affirmative Commission determination under title VII of the Tariff Act of 1930 [19 U.S.C. 1671 et seq.] or this subsection, the Trade Representative may, after consulting with the congressional committees under paragraph (5), direct the administering authority to revoke the antidumping or countervailing duty order in whole or in part.

(b)  Action by administering authority
     (1)  Consultations with administering authority and congressional committees
     Promptly after a report by a dispute settlement panel or the Appellate Body is issued that contains findings that an action by the administering authority in a proceeding under title VII of the Tariff Act of 1930 [19 U.S.C. 1671 et seq.] is not in conformity with the obligations of the United States under the Antidumping Agreement or the Agreement on Subsidies and Countervailing Measures, the Trade Representative shall consult with the administering authority and the congressional committees on the matter.
     (2)  Determination by administering authority
     Notwithstanding any provision of the Tariff Act of 1930 [19 U.S.C. 1202 et seq.], the administering authority shall, within 180 days after receipt of a written request from the Trade Representative, issue a determination in connection with the particular proceeding that would render the administering authority's action described in paragraph (1) not inconsistent with the findings of the panel or the Appellate Body.
     (3)  Consultations before implementation
     Before the administering authority implements any determination under paragraph (2), the Trade Representative shall consult with the administering authority and the congressional committees with respect to such determination.
     (4)  Implementation of determination
     The Trade Representative may, after consulting with the administering authority and the congressional committees under paragraph (3), direct the administering authority to implement, in whole or in part, the determination made under paragraph (2).

(c) Effects of determinations; notice of implementation
     (1)  Effects of determinations
      Determinations concerning title VII of the Tariff Act of 1930 [19 U.S.C. 1671 et seq.] that are implemented under this section shall apply with respect to unliquidated entries of the subject merchandise (as defined in section 771 of that Act [19 U.S.C. 1677]) that are entered, or withdrawn from warehouse, for consumption on or after –
          (A) in the case of a determination by the Commission under subsection (a)(4) of this section, the date on which the Trade Representative directs the administering authority under subsection (a)(6) of this section to revoke an order pursuant to that determination, and
          (B) in the case of a determination by the administering authority under subsection (b)(2) of this section, the date on which the Trade Representative

directs the administering authority under subsection (b)(4) of this section to implement that determination.

(2)    Notice of implementation

(A) The administering authority shall publish in the Federal Register notice of the implementation of any determination made under this section with respect to title VII of the Tariff Act of 1930 [19 U.S.C. 1671 et seq.].

(B) The Trade Representative shall publish in the Federal Register notice of the implementation of any determination made under this section with respect to title II of the Trade Act of 1974 [19 U.S.C. 2251 et seq.].